304 So.2d 613

**Eugene MOSLEY**

**v.**

**STATE.**

**7 Div. 316.**

Court of Criminal Appeals of Alabama.

Dec. 17, 1974.

Hubert H. Wright, Gadsden, for appellant.

William J. Baxley, Atty. Gen., and Donald G. Valeska, II, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was put to trial upon a two-count indictment charging, (1) burglary in the first degree, and (2) rape. He was represented at arraignment and trial by counsel of his choice. He pleaded not guilty. The jury returned a verdict finding him guilty under count two of the indictment and fixed his punishment at fifteen years imprisonment in the penitentiary. After conviction, appellant was determined to be indigent, and he was furnished a free transcript. New counsel was appointed to represent him on appeal.

This is another interracial rape case. Cases of this type are coming to this court at an alarming rate, as we have pointed out before.

The prosecutrix was a twenty-five year old married woman living with her husband in a predominately black section of East Gadsden. They lived in a duplex apartment and the bedrooms were upstairs. She was far advanced in her third trimester of pregnancy. In fact, she was rapidly approaching term time at the time she was raped.

Prosecutrix's husband worked the third shift at the Goodyear Plant. He went to work around 7:30 P.M. on December 1, 1972, and his shift ended at 7:00 A.M. on December 2, 1972. Prosecutrix did her household chores after he left and looked at the clothes they had purchased for the new baby, and she looked at television for a long time. She went to bed at 1:00 A.M. She was dressed in a nightgown and had on a pair of under pants. She was awakened at 2:30 A.M., when she heard a noise just outside her bedroom. The noise sounded like someone was doing something with a chain. The next thing she knew a black man was at her bedside. There was enough light filtering through the blinds in her bedroom from a street light for her to see the man was black and wearing white work gloves. She started screaming and the man began to choke her and threatened to kill her if she did not hush. She continued to scream and her assailant ran a gloved finger down her throat and scratched the inside of her mouth to the extent she started bleeding. She had to go to the bathroom to spit up the blood. The man made her come out of the bathroom and go downstairs to the kitchen with him. She asked him to let her get a housecoat as she was cold, and he refused her request. When the man entered the house by breaking a window in the back of the duplex, he pulled the circuit switch which put out the front porch light and a table lamp by the couch in the living room that she left on when she retired for the night. He made her get two beers from the refrigerator. He forced her back upstairs and told her to drink one of the beers. She told him she did not drink. He drank one beer and grabbed her and forced her to drink a part of the other can of beer. This made her nauseated and she had to go back to the bathroom. He went to the bathroom with her and held her arm while she lost the beer. He then forced her to the bed and was trying to kiss her. She turned away and started hitting him. He subdued her and told her if she submitted to him he would not hurt her. She started screaming again and he beat her in the face to quiet her. He asked her if she had ever been with a colored guy before and wanted to know why she had not. He was most profane and used all kinds of bad words and obscenities to her. He told her that she and her husband had been making fun of him, and he was going to get her and her husband. Neither she or her husband had ever known this man before. He told her if she did what he wanted her to that he would not hurt her. She told him she was pregnant and he said he did not believe her. He then tore her pants off and raped her. After it was over, she went to the bathroom and was gone a long time. He kept hollering at her to come out of the bathroom and threatened her life if she did not come out. She finally came out and he made her lie beside him on the bed. When he pulled the circuit switch, the furnace went off and it got very cold in the house. He went downstairs to try and get the furnace on and he kept hollering to her that if she used the telephone he would kill her and she was scared to use the phone. He could not get the furnace on and came back upstairs and got back in bed with her. He asked her if she was afraid of him, and she said yes. He told her he was not going to hurt her any more but he was going to stay with her until just before her husband returned from work.

He stayed in bed with her until after 6:00 A.M. It was good daylight then and she got a good look at him. She was able to describe him to the investigative officer later. She said he had bushy hair but not to the extent that he wore an afro type

hair style and he wore a mustache. His features made a deep impression on her. He told her he was leaving as it was almost time for her husband to come home. He told her she had better not tell the police or anyone else what had occurred, and if she did, he would get her and her husband. He told her he was a member of a club, and they would take care of her if she told anyone.

Prosecutrix did not know that appellant lived across the street from her until after he was arrested. He, no doubt, knew what time her husband went to work and what time he returned home.

Shortly after leaving prosecutrix' home, appellant called her and accused her of talking to someone and she told him she had not talked to anyone. She recognized his voice as she became familiar with his voice during her night-long vigil. He called again at 8:00 A.M. to accuse her of talking and made threats on her life. Her husband took the telephone from her and the caller hung up. He called her the third time at 7:50 P.M. and continued to threaten her life if she talked.

Prosecutrix's husband came home a few minutes after 7:00 A.M. He went to the refrigerator and found two cans of beer missing. He knew his wife did not drink and he asked her if any one had been to the house. She told him a black man broke in the house and beat her up. She was in bed, and he saw she was beaten up real bad. Her face was bloody and puffed up on one side and blood was coming out of her mouth. She was crying and hysterical. She did not tell him at that time that she had been raped as the threat of death was still ominously hovering over her. Her husband said he was going to call the Police Department and she begged him not to as she was in mortal fear of her life, the life of her baby, and her husband's life, but he called anyway.

Sgt. Gerald C. Poe of the Gadsden Police Department responded to the call. He and prosecutrix's husband inspected the premises and found the glass in a back window was broken out, but the officer was unable to lift fingerprints due, no doubt, to the fact that the intruder was wearing gloves. The husband found a cash receipt for $45.00 from a finance company lying on the kitchen floor. The receipt was dated 11/30/72 and was issued to "Eugene Mosley". The receipt was given to the officer and was introduced in evidence at appellant's trial without objection.

Sgt. Poe interviewed prosecutrix and it was at this time that she revealed that she had been raped. She gave the officer a detailed description of the rapist and an investigation got under way.

Prosecutrix's husband carried her to the hospital where she remained several hours after a pelvic examination. The doctor feared that she might miscarry. She was sent home with instructions to stay in bed.

Several days later a detective who was assigned to the case brought the prosecutrix a photograph of a line up of six black suspects and the appellant was one of them. Prosecutrix immediately picked out the appellant as the man who raped her.

The detective showed her another photograph of a three-man line up in which appellant was one of the suspects and prosecutrix again identified him.

In addition to these two line-up photographs, prosecutrix made a positive and unequivocal in-court identification of the appellant as her assailant, and the one who stayed in her bedroom two and one-half hours after he penetrated her and gratified his lust.

Appellant was arrested on December 21, 1972, and charged with nighttime burglary and rape. He was given the *Miranda* rights and warnings and signed a waiver of rights form. He also signed a waiver of counsel form for a line up. After proper predicates were laid both of these executed forms were introduced in evidence.

He did not make a statement to the interrogating officer.

Appellant did not testify but offered two witnesses as to his good character and nine witnesses as to an alibi. The alibi witnesses gave conflicting testimony as to time, places and persons concerning the whereabouts of appellant the entire night that prosecutrix was raped. Suffice it to say that the alibi witnesses placed appellant in a town thirty miles from the scene of the crime and during the hours prosecutrix testified that he was in bed with her.

Appellant claims error to reverse was committed during the progress of the trial when some unidentified person communicated with one of the jurors. When this matter was brought to the attention of the trial judge, he recessed the case and conducted a hearing in chambers. After thoroughly investigating the report, outside the presence of the jury, the court found the report to be without merit. There was no motion made for a mistrial.

It is axiomatic that the jury in a criminal case should be entirely separated from the world, and no outside communication with the jury should be permitted from the beginning of the trial until the verdict is rendered. Leith v. State, 206 Ala. 439, 90 So. 687.

The trial court found the report to be utterly without foundation, and there was no error in resuming the trial and carrying it to a conclusion.

Appellant also contends that he was represented by incompetent counsel. Appellant employed a firm of lawyers in Birmingham to represent him, and they did a commendable job in protecting all of his constitutional rights at every stage of the trial. The record simply does not support appellant's contention as to incompetent counsel.

Appellant presented a strong alibi case. Alibi testimony, like all other evidence, is an issue to· be determined by the jury. The jury resolved this issue against appellant and that is that. Brown v. State, 229 Ala. 58, 155 So. 358; Gillis v. State, 242 Ala. 550, 7 So.2d 563.

There was no motion to exclude the state's evidence, and no motion for a new trial; there was no request for the affirmative charge or any other charges, and there were no exceptions reserved to the oral charge to the jury. There were no adverse rulings of the court on the admission of evidence which contain any merit. In this state of the record nothing is presented for review. Eady v. State, 48 Ala.App. 726, 267 So.2d 516, and cases there cited.

We have carefully examined the record for errors injuriously affecting the substantial rights of appellant and have found none.

Accordingly, the judgment of conviction is affirmed.

Affirmed.

All the Judges concur.