321 So.2d 713

**R. D. DULANEY**

v.

**STATE.**

**6 Div. 848.**

Court of Criminal Appeals of Alabama.

Aug. 19, 1975.

Rehearing Denied Oct. 1, 1975.

John Self and Al Tidwell, Hamilton, for appellant.

William J. Baxley, Atty. Gen., and Sarah M. Greenhaw, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant and one Chervis Scott were jointly indicted for grand larceny of four hogs and buying, receiving, concealing or aid in concealing stolen property. A severance was granted and the state dismissed the grand larceny count in the indictment. Appellant was put to trial on count two of the indictment which, in pertinent part, reads as follows:

"The Grand Jury of said County charge that before the finding of this Indictment, Chervis Scott, and R. D. Dulaney, whose names are to the Grand Jury otherwise unknown, did buy, receive, conceal, or aid in concealing two black hogs or shoats weighing about forty pounds each, of the value of about forty dollars each, and two white hogs or shoats weighing about sixty pounds each, of the value of about fifty dollars each, all of the total value of about one hundred and eighty dollars, the personal property of Floyd Long, which had been stolen from Floyd Long, the said Chervis Scott and R. D. Dulaney knowing or having reasonable grounds for believing that they had been stolen and not having the intent to restore them to the owner, against the peace and dignity of the State of Alabama."

Scott was tried and convicted of buying, receiving, concealing, or aiding in concealing stolen property and was sentenced to five years in the penitentiary. His appeal to this court was affirmed on June 17, 1975.

Appellant was convicted under the above quoted count of the indictment and was sentenced to five years in the penitentiary.

Mr. Billy Miles, the Sheriff of Marion County, Alabama, testified that his office got a call from Mr. Floyd Long reporting he had four hogs missing from his hog lot. The hogs were described as two black ones and two white ones. He stated that later he found three hogs in a freshly built fence in a wooded area of Marion County.

From the record:

"Q Would you please tell the jury when, where and how you came across these hogs, please sir.

A It was Northwest of Hamilton here near the Cherry Hill Church of Christ. We were out just checking the country and checking on stills, and this Mr. Kelley that had lived there had committed suicide, and there wasn't anyone living in this house at the time, and I told the ABC boys, 'Let's drive by this house and check it . . . No one is living in it', so we got out and I found three hogs there in a pen that was just freshly built, and I told the ABC boys, I said, 'Well, from the way Mr. Long described his hogs, right here is some of his hogs', so I came back and called Mr. Long, and he and Mr. Johnson went out and looked at the hogs and . . ."

The Sheriff further testified that after discovering the hogs he called Mr. Long and told him where he found the hogs and to meet him and see if he could identify the hogs. Mr. Long told the Sheriff the hogs belonged to him after he looked at them. The Sheriff further testified that the closest home to the place where he found the hogs was occupied by Mr. John Loyd Cochrane; that later he went to

Hackleburg to the home of Mr. Manuel Cochrane where he viewed some more hogs.

On cross-examination he testified that he was not in his office when the call came from Mr. Long, but his secretary took the message and made a note of the description of the missing hogs. According to the note there were two black hogs and two white hogs missing and they weighed 40 to 60 pounds; that two of them had their tails off and two had long tails. He further testified that he told Mr. Long and Mr. Johnson to meet him that afternoon and they would pick the hogs up. Both Long and Johnson helped the Sheriff load the hogs.

In the course of the Sheriff's investigation as to the theft of the hogs he said he interviewed Mr. John Loyd Cochrane, and Mr. Cochrane told him he bought the hogs and he gave a written statement concerning the persons he bought the hogs from. He told the Sheriff he paid $80.00 for the four hogs. The statement Cochrane gave the Sheriff is as follows:

"A  The statement he made to me was that he was getting ready to go to the Christmas Parade, and they brought one hog and he had $5.00 and gave them the $5.00, then he went to buy some cigarettes. They later brought three more and he had to borrow $75.00 to pay for those three, and he said that R. D. Dulaney, and James Ray and Chervis Scott broght (sic) them; that he paid Chervis the money, and then he signed the statement."

After getting the signed statement from Mr. Cochrane, warrants were sworn out for Dulaney, Rea and Scott.

Mr. Willie Johnson testified that he had known Mr. Long for about three years and that they were in business together. They traded hogs, cows and farmed together. He stated that Mr. Long had a farm about eight or nine miles northwest of Hamilton, Alabama, that Johnson owned 80 acres and there was a 40 between his farm and Mr. Long. He stated he was farm manager for Mr. Long and that they worked on "halfs." That it was his duty to take care of all the hogs and cattle.

He further stated that Mr. Long gave him $120.00 in August to buy some hogs. He bought four black hogs weighing 35 to 40 pounds each and took them to Mr. Long's farm and put them in the pasture; that he traded a cow for five white hogs and put them in the same pasture with the black ones. That he fed the hogs every day and counted them every time he fed them. That he fed the hogs on the morning of December 11, 1973, around nine o'clock and that at that time there were about 25 hogs including pigs and shoats. After feeding the hogs that morning, he loaded up a load of cows and carried them to Florence, Alabama, and got back home at nine-thirty that night. The next day, December 12, he went to feed the hogs and found four missing—two white and two black. He said one of the whites was "straight eared" and the other white was "flop-eared," and the two black hogs were almost identical. He stated that the tails on the white hogs were cut off very short, but the tails on the black hogs were not cut. Mr. Johnson further testified that he observed fresh car or truck tracks leading right up to the gate to the pasture and the ground and leaves looked like something had been drug over the ground near the gate.

Mr. Johnson called Mr. Long and reported the four missing hogs to him. He went with Mr. Long to the place where the Sheriff told Mr. Long he had found some hogs. There were three hogs in the pen and they identified two of them as their hogs. They went to Hackleburg and identified the other two. The four hogs were put back in the pasture from which they were stolen. Mr. Johnson further testified that the fair and reasonable cash market value of these hogs on the day they were stolen was $70.00 to $80.00 each.

Mr. Floyd Long testified for the state and his testimony corroborated Mr. Johnson's testimony in all pertinent details.

Mr. John Loyd Cochrane testified for the state. He stated that on the night of December 11, 1973, around seven o'clock, three men drove to his house and sounded the horn. He went out to the truck and recognized Chervis Scott, James Rea, and he thought the third man was one of the Dulaney boys. This third individual had long hair about an inch below his ears. They had two hogs they wanted to sell for $30.00 each. Cochrane told them he would pay only $20.00 for each hog and they accepted his offer. They told Cochrane they had two more hogs and they would deliver them later that night. Cochrane had only $5.00 at that time but he went to his brother's house and borrowed $75.00. These same three men came back later that night with two more hogs and he paid them $80.-00 for the four hogs.

This witness further testified that he gave the Sheriff a statement as to whom he bought the hogs from. The Sheriff wrote out the statement and read it to him and he signed it. The last name on the statement was "R. D. Dulaney."

The most charitable thing that can be said about Mr. Cochrane's testimony as to the identity of the third person that was in the pickup truck that delivered the four hogs to his home on the night of December 11, 1973, is that it was most confusing and uncertain. This was manifested on direct examination, cross-examination and to questions propounded to him by the court. He stated that he had been knowing the Dulaney twins for four or five years and knew their names were R. D. and R. C. Dulaney. He described the third person in these words, "Well, he was, I would say, medium build and kind of slim. He had long hair."

We will quote the questions posed by the court to Mr. Cochrane and his answers.

"THE COURT: Mr. Cochrane, I have a feeling that the jury is confused about the third individual when you testified about Mr. Scott and Mr. Rea . . . Tell the jury if you have seen the individual that you saw there that night that you bought the hogs around this courthouse today?

WITNESS: You mean, really identify the one I saw that night?

THE COURT: No, sir. Let me put it this way: Are you able to tell this jury that it is your best judgment that the third individual you saw there, that is, in addition to Chervis Scott and James Rea, is one of two people? Is this what you are telling the jury?

WITNESS: That was my opinion. That is what I thought, it was one of the two.

THE COURT: Which two individuals was that, in your opinion?

WITNESS: Which two?

THE COURT: Yes, sir.

WITNESS: I thought it was one of the twins . . . the Dulaney boys.

THE COURT: Who are the Dulaney boys? Who are they? Tell the jury their names.

WITNESS: R. C. and R. D. Dulaney."

*    *    *    *    *    *

"THE COURT: Mr. Cochrane, I'm still confused about it, and I feel like the jury is too. Without any characterizing at all, other than what I give you in the form of this question I want to know whether on the night of December 11, in addition to Chervis Scott and James Rea, it is your best judgment that one of the Dulaney twins was present there with James Rea and Chervis Scott. Just answer 'yes' or 'no', one of the two.

A  I would say I thought it was one of them, I believe, you know, that was who

I thought was one of the twins. This is as far as I could go with it, definitely."

The state called R. C. Dulaney as a witness and he testified that on December 11, 1973, he ran a cotton picker in Winston County and got home just before dark. There was a Christmas parade in Hamilton that night and he carried his children to see the parade; that when the parade was over he went back home and did not leave again that night. That the parade lasted about an hour and started at seven o'clock. He further stated that he did not go to John Loyd Cochrane's house on the night of December 11, 1973, and that he did not get near his house any time that day or night. He further testified that the longest he had ever worn his hair was about half way down his ear.

Appellant testified that on December 11, he was working in Tupelo, Mississippi, that he left at four o'clock in the morning and did not get back home until seven or eight o'clock that night. That he did not see Chervis Scott, James Rea or John Loyd Cochrane at any time that day or night and that he had nothing to do with the delivery of any hogs to Cochrane's home that night.

On cross-examination he stated he was hanging sheetrock in a house that was being constructed in Tupelo, but he could not recall the name of the contractor he was working for. He stated he was riding with Arthur Rea, brother of James Rea. He said he didn't know where Mr. Cochrane lived and had never been to his house. He was asked if he had ever worn his hair completely below his ears, and he replied, "I guess I have." He was asked what kind of vehicle he was riding to work in with Arthur Rea, and he said, "He had an old Plymouth, or something."

On rebuttal, Deputy Sheriff, Herman "Pete" Corkran, testified that he saw appellant's brother, R. C. Dulaney, on December 19, 1973, and his hair was not long.

Sheriff Miles testified that on December 22, 1973, appellant's hair was over his ears, "kind of down to his collar."

We note here that appellant did not call Arthur Rea to support his alibi as to where he was on December 11, 1973.

Appellant made a motion to exclude the state's evidence on the ground that a prima facie case had not been made out. He requested the affirmative charge, and it was refused. He made a motion for a new trial and it was heard and denied.

In *Young v. State,* 283 Ala. 676, 220 So. 2d 843, the Supreme Court said:

"Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the state's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error. *Drummond v. State,* 37 Ala.App. 308, 67 So.2d 280; *Wade v. State,* 24 Ala.App. 176, 132 So. 71."

Alibi testimony, like all other evidence in a criminal prosecution, is an issue to be determined by the jury. The jury resolved this issue against appellant simply because they did not believe his testimony. *Brown v. State,* 229 Ala. 58, 155 So. 358; *Mosley v. State,* Ala.App., 304 So.2d 613; *Price v. State,* 53 Ala.App. 465, 301 So.2d 230.

It is settled law in this case that a fact may be established as firmly by the testimony of one witness as by the testimony of an entire community. *Gray v. State,* 38 Ala.App. 508, 88 So.2d 798; *Nabors v. State,* 82 Ala. 8, 2 So. 357; *Smith v. State,* 53 Ala.App. 27, 296 So.2d 925.

Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this court has no right to disturb the verdict. Whether there is evidence of the defendant's guilt is

a question of law and its weight and probative value is for the jury. *Haggler v. State,* 49 Ala.App. 259, 270 So.2d 690; *Bolton v. State,* 21 Ala.App. 373, 108 So. 631; *Washington v. State,* Ala.App., 313 So.2d 544; *Taylor v. State,* Ala.App., 314 So.2d 104.

■ Conflicting evidence always presents a question for the jury as to the guilt of the defendant unless the evidence palpably fails to make out a prima facie case. *Morris v. State,* 47 Ala.App. 132, 251 So.2d 629; *Jones v. State,* Ala.App., 307 So.2d 59.

In *Hill v. State,* 207 Ala. 444, 93 So. 460, the Supreme Court held:

"In every criminal prosecution the burden is on the state to prove beyond a reasonable doubt that the crime charged has been in fact committed, and that the accused is the person who committed it. *Winslow v. State,* 76 Ala. 42, 47; *Smith v. State,* 133 Ala. 145, 150, 31 So. 806, 91 Am.St.Rep. 21; *Perry v. State,* 155 Ala. 93, 46 So. 470; *Sanders v. State,* 167 Ala. 85, 52 So. 417, 28 L.R.A. (N.S.) 536.

■■ Circumstantial evidence may afford satisfactory proof of the corpus delicti; and if any facts are shown from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury, and other evidence tending to implicate the accused is thereby rendered admissible. Cases supra; *Matthews v. State,* 55 Ala. 187; *Ryan v. State,* 100 Ala. 94, 14 So. 868."

■ After a witness has testified that he has previously seen a man, it is permissible to ask his opinion or judgment as to whether or not a man he saw later was the same person. *Miller v. State,* 43 Ala.App. 257, 189 So.2d 576.

■ Notwithstanding the confused testimony of Mr. Cochrane, the totality of the facts and circumstances in this case presented questions for the jury's determination and the evidence was sufficient to sustain the verdict. There was no error in the denial of the motion to exclude the state's evidence, in the refusal of the requested affirmative charge nor in overruling the motion for a new trial. *Ellis v. State,* 43 Ala.App. 157, 182 So.2d 910.

We have carefully examined the record for errors injuriously affecting the substantial rights of appellant and have found none.

The judgment of conviction is affirmed.

Affirmed.

All the Judges concur, except CATES, P. J., not sitting.