Appellant was convicted of murder in the second degree, and the jury fixed his punishment at 35 years in the penitentiary. The sentence was in accordance with the verdict of the jury. At arraignment and trial he was represented by court-appointed counsel. He pleaded not guilty and not guilty by reason of insanity. He gave notice of appeal and was furnished a free transcript and trial counsel was appointed to represent him on appeal.
The evidence for the State was circumstantial and was put to the jury on circumstantial evidence. There were no eye witnesses to this killing. Appellant did not testify but offered some evidence tending to establish an alibi.
Around 6:00 a.m., on August 31, 1975, the body of a Negro woman, Cora Askew, was found on the side of the Ashurst Bar Road just off Highway 49 in East Tallassee, south of the city of Carrville, Tallapoosa County, Alabama. She was found by Mr. Thomas Crawford Smith who notified the Carrville Police Department. Mr. Smith drove back to the intersection and waited until the police arrived so that he could guide them to the body of the deceased. He testified that when he got back to the body with Police Officer William Durham, the body was in the same condition as it was when he first observed it.
Mr. Smith further stated that a number of people soon gathered and everyone was trying to get an identification of the woman. Prior to this time Mr. Smith did not know appellant but he came to the scene a little later that morning and said he knew the woman. He identified her as Cora Askew.
Officer William Durham of the Carrville Police Department testified that he was familiar with the Ashurst Bar Road and that he was on routine patrol on the morning of August 31, 1975, and got a radio call to go to the place where the body was found. He said the body was a black female with her head in the ditch with her feet facing the pavement on the side of the Ashurst Bar Road. He stated he made a casual examination to see if she was dead and there was no form of life at all, pulse, heartbeat, or anything. That he observed blood on her head and face and blood was coming out her right ear and nose. The body was cold. He was present when Chief Ray Sides arrived and the body had not been moved when the Chief got there.
This witness further testified that he did not know appellant but that he drove up in a 1973 green Chevrolet with a Fulton County, Georgia tag on it. That appellant stopped his car and got out and asked the officer if he could look at the body to see if he knew her. He was told to look at the body but not to disturb anything. Appellant observed the body and identified her as Cora Askew and said she was his girl friend. He stated that he and the deceased had been living together in Atlanta, Georgia. Durham stated that one Frankie D. Smith drove appellant's automobile from the scene to the Carrville Police Department and he followed in his patrol car.
On cross-examination Durham testified that appellant arrived at the scene around 6:30 a.m. and there was another black male in the car with him.
On redirect examination he stated that when appellant arrived the first time, and after he identified the body, he made the statement that he thought he knew who she was with that night. The officer told appellant he was protecting the scene until the proper authorities arrived as it was out of his jurisdiction and he asked appellant to wait until the proper authorities came to the scene and appellant said he would wait. However, appellant left the scene saying he wanted to go and notify the family. The officer asked him again to wait but appellant left anyway. A short time later he returned and waited for the arrival of other officials. *Page 823 
The Chief of Police of Carrville, Alabama, Ray Sides, testified that the radio operator called him at his home and told him that a body had been found on the Ashurst Bar Road and the Deputy down there was not working that morning and asked him to go to the scene until the State officers got there. When the Chief arrived, he saw appellant sitting in his car and asked him his name and where he was from. Officer Durham told the Chief that appellant had informed him that he was a boy friend of the deceased. The Chief asked appellant how long it had been since the deceased came down from Atlanta. About that time Deputy Sheriff Moore arrived and the appellant drove from the scene.
While appellant was gone, another black male, Lawrence Hodnett, drove up and told the officers that the last time they had seen the deceased was at the house with appellant. The officers radioed Tallassee to be on the lookout for him and in a few minutes, appellant came driving back to the scene at which time the Deputy took appellant into custody.
Deputy Sheriff Moore had appellant's automobile moved to the Carrville Police Department where it was locked in a large storage room behind City Hall and locked the car and the doors to the storage room.
Deputy Sheriff Lewis G. Bowman of Tallapoosa County testified that he met the State Toxicologist at the Carrville Police Department at 2:45 p.m. on August 31, 1975. He stated he unlocked appellant's car and let the Toxicologist take samples of blood stains and also scrapings from different parts of the automobile. He said he stayed with the Toxicologist until he got through with his examination of the automobile and then he inventoried the car. The inventory, among other things not necessary to set forth, consisted of 14 live rounds of .38 caliber cartridges, five live rounds of .32 caliber Smith and Wesson longs, and one live round of .32 caliber Browning short.
On cross-examination he testified that he did not find a pistol in the car. He further stated he saw a good deal of blood or spats of blood in different parts of the automobile.
Mr. Richard James Jackson testified that the deceased was his first cousin and that on the night of August 30, 1975, appellant brought the deceased to her father's house — Willie Hodnett. That he stayed at Willie Hodnett's house until about 11:30 that night talking to the deceased. He left to go to his house and that was the last time he saw Cora Askew alive. He stated that the deceased had been living in Atlanta but was a native of Tallapoosa County and was there on this occasion to visit her family. She was married to Jessie Askew and had two children, a boy and a girl. That the boy was living with him and the girl was living with her grandfather, Willie Hodnett.
Willie Hodnett testified that the deceased was his daughter and came to his house on August 30, 1975. He left home early that night and his daughter was there when he left. He returned around 1:00 a.m. and she was not at home. He did not see her alive again.
Mr. Henry L. Anderson was called as a witness for the State. He was a deaf mute and had to testify through an interpreter. The interpreter was Mr. Spencer Mason who testified that Anderson was 27 years of age and that he was born on his and his father's place. They raised him from an infant and looked after him as a son. They sent him to school in Talladega where he studied sign language for a period of ten years and since that time, he had been working in the tire store with Mr. Mason.
Mr. Mason testified before the Court that he could intelligently communicate with Anderson with his fingers, motions and gesticulations and had done so for a great many years. He told the Court that Anderson would not tell an untruth for *Page 824 
anything but he was a deaf mute lacking the sense of hearing and the faculty of speech. He said Anderson learned the official sign language at the Talladega school and that he had become familiar with it to the point that he spelled every word with his fingers and other motions and that this was the only way Anderson could understand. He further told the Court that he was not interpreting what he thought Anderson was trying to say but he merely related what he was saying and he would repeat the questions to him to be sure he was telling the truth.
Appellant's counsel objected to Mr. Mason asking questions to Anderson on the ground that the Court and jury would be getting the testimony of Mr. Mason rather than the testimony of Mr. Anderson. The Court overruled the objection, saying the jury could take the testimony for what it is worth. Thereupon, the Court swore Mr. Anderson to speak the truth through Mr. Mason saying, "At this time, the questions are being asked Henry Lee Anderson by Mr. Tom F. Young, through Mr. Mason, and Mr. Mason is orally responding the answers to the Court." We think it well to set out Mr. Anderson's testimony to questions posed by Mr. Mason.
"DIRECT EXAMINATION:
"BY: TOM F. YOUNG:
"WITNESS: HENRY LEE ANDERSON (DEAF AND DUMB)
"Q. Ask him what his name is.
"A. (Mr. Mason talking) Henry Lee Anderson.
"Q. Ask him how old he is.
"A. 27.
"Q. Ask him where he lives.
"A. Tallawycka.
 "Q. Ask him if he has ever seen the defendant, George Brown.
"A. Yes sir.
 "Q. Ask him, did he see George Brown, on the early morning of August 31st, when the body of Cora Askew was found on Ashurst Bar Road.
"A. Yes sir.
"Q. Ask him where he saw him.
"A. This side of Five Points.
 "Q. Did he ask George Brown for a ride, or did he get a ride with George Brown on that occasion.
 "BOBBY R. BOWLES: I don't want to be unduly harsh, but, I want to object to Mr. Young leading the witness. I realize his difficulty in getting out what he wants, but, I still think that in the interest of Mr. Brown, I will have to ask that he not lead.
"COURT: Don't lead.
 "Q. I will ask you to ask him, whether or not he got a ride with Mr. Brown.
"A. He said, Mr. Brown stopped and picked him up.
 "Q. Ask him where he went, with the Defendant, George Brown.
"A. He went to the housing project.
 "Q. What did the witness do when he went to the housing project, what did he see?
 "A. He saw George go in the house, he got a rag, and come back out to the car, he helped George clean the car.
"Q. What was it he helped him clean off the car?
"A. Blood.
 "BOBBY R. BOWLES: Your Honor, I don't see Henry Lee Anderson doing anything but shaking his head, I'm having a hard time believing he's saying these things.
"COURT: Let him testify. *Page 825 
 "BOBBY R. BOWLES: I think he told Mr. Mason in the past, and now, Mr. Mason is just repeating it, to the Court.
"MR. MASON: I ask him, did he see blood.
"BOBBY R. BOWLES: And that was not the question.
"TOM F. YOUNG: I will ask him that then.
"Q. Did you see blood?
"A. Yes.
"Q. Where was the blood?
"A. On the door.
 "COURT: I think his objection is somewhat good. See if you can get him to tell you, without you reiterating — you see what I mean? You are leading the witness, perhaps, instead of Mr. Young.
 "A. He told Henry Lee to stay in the car, he went in the house, and come back, he saw him wipe the door.
"COURT: Then what happened?
 "A. Then they got in the car and they drove over and saw the body.
"COURT: Was anybody there?
"A. Him and George were together.
"COURT: Do you have any idea about the time?
"A. About, 6:00 o'clock.
"BY: TOM F. YOUNG:
 "Q. Did he see any blood on the clothes or the shoes of George Brown.
"A. Yes sir.
 "Q. Ask him whether or not he saw any blood on the shoes —
 "BOBBY R. BOWLES: He already asked that, may it please the Court.
"Q. I said, clothes and shoes.
"A. Yes sir.
 "Q. Ask him, what, if anything, did he see done about that blood on George Brown's shoes.
"A. He just saw specks of blood.
"Q. On his shoes?
"A. Yes sir.
 "Q. Ask him, whether or not, anybody wiped the specks of blood off of George Brown's shoes.
"A. George wiped it off.
"TOM F. YOUNG: Take the witness.
"CROSS-EXAMINATION:
"BY: BOBBY R. BOWLES:
 "Q. Ask him, whose house George Brown went into to get those rags, he was talking about.
"A. He doesn't know her name.
"Q. Ask him if he knows which apartment it was.
"A. On the right hand side.
 "Q. Ask him if it was a woman by the name of Robatta Pace.
"A. He doesn't know her first name.
"Q. Was the last name Pace?
 "A. I asked him, `Pace,' he said it is Pace, but, that's all he knows.
 "Q. Ask him, when he got in George Brown's automobile, if he found a pistol in that car.
"A. No, he didn't.
 "Q. Ask him what color shoes George Brown had on that morning.
"A. White shoes.
 "Q. Did he say whether or not there was blood on the clothing of George Brown?
"A. No, he didn't see any on George Brown. *Page 826 
"THAT'S ALL.
"REDIRECT EXAMINATION:
"BY: TOM F. YOUNG:
 "Q. Ask him, if he saw George Brown wiping the car door, and the blood on his shoes, before he went down to where Cora Askew was —
 "BOBBY R. BOWLES: We are going to object to a leading question.
"Q. State whether or not, —
"COURT: Overruled.
 "Q. This was before he went down to where Cora Askew was laying on the side of the road.
"A. Before.
"THAT'S ALL."
The State then called four witnesses from the State Department of Toxicology, Taylor Nogles, William H. Landrum, Carlos Rabren, and Tellis V. Hudson, who collectively established the fact that the deceased was killed by a gunshot wound to the head and that such wound was caused by a .32 caliber slug. They further testified as to blood samples and gunpowder particles found in the automobile of appellant. All of the evidence collected by these experts was carefully preserved in sealed envelopes and properly initialed so as to assure there was no missing link in the custody and control of this evidence. There was no contention that there was a missing link in the chain of the evidence.
On August 31, 1975, an autopsy was performed on the body of Cora Askew by State Toxicologist Carlos Rabren and he found an entrance wound in front of the left ear and he traced the path of this wound into the brain and found a .32 caliber slug. He recovered the slug and it was admitted in evidence without objection. He stated the cause of death was trauma, shock, and intracranial hemorrhage, associated with a gunshot wound. He took a blood sample from the heart of the deceased which was turned over to Mr. William H. Landrum of the Department of Toxicology for a serological analysis and comparison with the blood samples found in appellant's car. The serological tests of the blood found in appellant's car and the blood taken from the heart of the deceased proved to be the same type known as Group O-MN.
State Exhibits 14 and 15 were photographs of the head and face of the deceased showing the entrance wound just in front of the left ear and blood on her face, nose and left eye. These photographs were introduced in evidence over appellant's objections that they tended to prejudice and inflame the jury against him.
As we have pointed out appellant did not testify in his behalf but he offered alibi testimony.
Appellant's father testified that his son (defendant) came to his home on the night of August 30, 1975, arriving about 9:00 p.m. and stayed until shortly after 12:00. As he was leaving, appellant said he was going to pick up his girl friend and go and eat some chicken.
Vatta Pace testified that she lived in Tallassee, Elmore County, Alabama, and that she knew appellant. She denied that appellant came to her house on the morning of August 31, 1975, and got some rags out of her house.
On cross-examination she admitted appellant came to her house early that morning and the man who could not hear or talk was with him.
Tooth Pace, the daughter of Vatta Pace, testified that appellant came to her mother's house about 1:30 a.m. on August 31, 1975, and stayed until 5:30 a.m. She denied that anyone came with him.
It is permissible for a deaf mute to testify as against the objection that the party against whom such testimony is given *Page 827 
will be put to a great disadvantage in cross-examination to test the deaf mute's credibility. Burgess v. State, 256 Ala. 5,53 So.2d 568; Pruitt v. State, 232 Ala. 421, 168 So. 149.
In Burgess v. State, supra, the Supreme Court held:
 "In determining the qualifications of such witness to testify and the selection and qualification of the interpreter, much must be left to the sound discretion of the trial court who has full opportunity to see and observe the witness, and the interpreter, in the presence and hearing of the interested parties and their counsel, much of which cannot be portrayed on the written pages of the record. Pruitt v. State, supra; 53 Am.Jur. p. 44, § 29. We, therefore, hold that the circuit court did not err in permitting the witness Grace Payne to testify against the defendant. Nor was error committed in allowing her brother Frank Payne to act as the interpreter of her testimony."
We hold the trial court did not abuse its discretion in allowing Mr. Mason to act as the interpreter of the testimony of Henry Lee Anderson.
There was no error in the admission of the photographs of the deceased. Such photographs are admissible in a murder prosecution when they shed light upon the character and location of the wounds on the victim's body and when the proper predicate has been laid. Snow v. State, 50 Ala. App. 381,279 So.2d 552; Boulden v. State, 278 Ala. 437, 179 So.2d 20.
Gruesomeness is not ground for excluding evidence consisting of photographs if it has a reasonable tendency to prove or disprove some material fact which is in issue or which at the time appeared to be probably in dispute or material, and, if it illuminates the issues in any way even though possessing a tendency to inflame the minds of the jury. Hurst v. State,54 Ala. App. 254, 307 So.2d 62.
As we have pointed out, the State relied on circumstantial evidence to convict appellant. Circumstantial evidence is entitled to the same weight as direct evidence is entitled to provided it points to the guilt of the accused. In cases where the State relies on circumstantial evidence for a conviction very wide latitude is allowed in making proof. Creel v. State,53 Ala. App. 504, 301 So.2d 267; Lowery v. State, 38 Ala. App. 505, 88 So.2d 854; McDowell v. State, 238 Ala. 101,189 So. 183.
Where there is a reasonable inference to prove the existence of the corpus delicti, the Court should submit to the jury for its consideration the question of the sufficiency and weight of the evidence tending to support that inference. Hines v. State,260 Ala. 668, 72 So.2d 296; Haggler v. State, 49 Ala. App. 259,270 So.2d 690; Felton v. State, 47 Ala. App. 182, 252 So.2d 108.
The corpus delicti in a homicide prosecution, and evidence sufficient for a conviction of the crime of murder, may be established through circumstantial evidence and such evidence is sufficient if its effect on the jury's mind is to produce a conviction of guilt of the defendant beyond a reasonable doubt.Payne v. State, 48 Ala. App. 401, 265 So.2d 185.
According to the tendencies of the State's evidence the deceased was appellant's girl friend and she was last seen alive with him. At 6:30 a.m. on the day her body was found on the roadside he came to the scene of the crime and identified her body and left the scene after being requested by a police officer to await the arrival of State officers. Blood of the same type of the deceased was found in his car. We cannot overlook the testimony of the deaf mute that appellant went to a house and got some rags to wipe blood off *Page 828 
his automobile and his shoes before returning to the place where the body was found.
All of these facts and circumstances along with his claimed alibi made and presented a jury question as to the guilt vel non of appellant. Mosley v. State, 54 Ala. App. 59,304 So.2d 613; Brown v. State, 229 Ala. 58, 155 So. 358; Gillis v. State,242 Ala. 550, 7 So.2d 563.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. Accordingly, the judgment of conviction is affirmed.
AFFIRMED.
TYSON, DeCARLO, and BOOKOUT, JJ., concur.