Appellant was convicted of robbery and the jury fixed her punishment at ten years in the penitentiary. She was represented at arraignment and trial by retained counsel who represents her on this appeal. She pleaded not guilty. After conviction she gave notice of appeal on March 4, 1976. Appellant is not indigent.
The Attorney General filed a motion to strike the transcript of the evidence on the ground that the reporter's transcript was not filed until June 16, 1976, more than 56 days from the date on which the appeal was taken, and there were no extensions of time for said filing. Neither was there a motion for a new trial filed in this cause.
This motion of the Attorney General is due to be granted unless we suspend the rules and accept the reporter's transcript and consider the case on its merits.
It is, therefore, ordered that under Rule 2 (b) the provisions of Rule 11 (b) be and the same are hereby suspended and the appeal in this case will be considered on its merits. *Page 450 
It is undisputed that on August 19, 1975, between the hours of 8:00 and 8:30 a.m., the Southside Drug Company located at 4316 South Court Street was robbed by two gunmen, one carrying a .20 gauge sawed-off shotgun. The evidence for the State tended to show that Mrs. Merle Sasser, an employee of the drugstore, opened the store for business that morning between 7:30 and 8:00, and she waited on a number of customers before Mr. Rex Riggins the pharmacist came on duty. According to Mrs. Sasser's testimony one of the men entered the store alone and purchased a bottle of shampoo from her, and he left the store stating that he had something in his car he forgot and would be back. She described this person as very neat with short hair, wearing a pair of blue jeans and a maroon colored sweat shirt. She stated that when he returned to the store, he was accompanied by another man who had dark hair and had it pulled back in a ponytail, that he was dressed in a pair of jeans and a man's undershirt.
She further testified that when they returned, there were some customers in the store and that the blond boy came toward the back where she was and the other dark haired boy was looking at some papers at the bottom of the magazine rack.
She stated that when Mr. Riggins came in, the blond haired boy pulled a shotgun and stuck it in Mr. Riggins' face and told him that this was a stickup and that he wanted all of the hard drugs in the drugstore and told him to open the safe. Mr. Riggins told him that the safe was open whereupon the man with the gun forced both Mr. Riggins and Mrs. Sasser back to the pharmacist department and made them lie down on the floor and threatened to shoot their ___ ___ heads off if they would not do what they were told to do. Both Mr. Riggins and Mrs. Sasser testified that these men were not disguised in any manner but that they were loud and boisterous and continued their threats to blow their ___ ___ heads off all the time the robbery was going on.
Mrs. Sasser further testified that a little girl named Karen Vance came in the drugstore immediately after the robbery and that she lived only three or four blocks away. It is admitted that Karen Vance was a ten year old deaf and dumb child and could only communicate by sign language or write an answer to a question posed to her.
Her mother, Margaret Vance, testified that Karen was a very bright child in the light of her handicap by being deaf and unable to speak and that she attended school at the "Children's Center." She further testified that her daughter went to the Southside Drug Store some time after 8 o'clock on the morning of August 19, 1975 and rode her bicycle. The State tried to use the mother of Karen as an interpreter but this proved to be very difficult and unsatisfactory, whereupon the Court sent for her teacher at the Children's Center, Ms. Gail Woods. Ms. Woods testified that she was Karen's teacher and was a deaf education teacher and that she was trained at the University of Tennessee where she obtained a B.S. in Speech and Hearing and Psychology and a Master's Degree in Deaf Education. Ms. Woods stated that she did not have too much difficulty in communicating with the child and that the child was below normal as compared to a normal ten year old child because of her language handicap but nevertheless she did have the mental ability to learn, to grasp knowledge, but that she must first obtain the language to do so. She further testified that she had discussed with Karen the difference between right and wrong on a daily classroom basis and that in her opinion, Karen knew the difference between right and wrong and that she knew the difference between telling the truth and telling a lie.
The Court decided that Ms. Gail Woods was competent to act as an interpreter and for the lawyers to pose questions to her concerning her knowledge of the facts leading up to and culminating in the robbery and that she in turn would communicate with Karen for her answers. *Page 451 
Karen Vance was then called to the stand where questions were propounded by the State and by appellant's counsel. Karen testified that in September she went to the store and she saw two men and one woman near the store in a green and black car and she saw the two men walk in the store and she later saw the two men return to the car. She saw appellant drive the car away from the store and she drove very fast. She was asked to look over the courtroom and see if she could identify the person that she saw driving the car and she pointed to appellant and identified her as the driver of the green and black automobile.
Appellant's counsel questioned the competency of Karen Vance to be a witness and this was a matter that had to be determined by the trial court.
Ms. Woods was asked the following questions and gave the following responses:
 "Q. Do you feel she understands the seriousness and consequences of taking an oath as a witness in a court of law?
 "A. I think that what she saw, she will report to the best of her ability. Now, as — because of her hearing — and I am saying this solely for her deafness — she may not — she does not understand, I am sure, perjury, this kind of technical lawyers' vocabulary but she knows the difference between the truth and a lie and what is right and what is wrong.
"Q. And what is expected of her as a witness?
 "A. And she knows the reason that she is here. And I believe that she will tell what she saw."
The Court allowed Karen Vance's testimony to be admitted into evidence through the interpreter Ms. Gail Woods.
Detective Cody Wood of the Montgomery Police Department was assigned to investigate the robbery of the Southside Drug Store and he went to the drugstore and got a description of the gunmen from Mrs. Sasser and Mr. Riggins. His investigation took him to Birmingham on two occasions, August 22 and August 26, 1975. He saw appellant at approximately 3:00 p.m. on August 26, at the Juvenile Detention Center in Birmingham. He had received a call from the Police Department in Birmingham the previous evening, that appellant was in custody at the Juvenile Detention Center.
When Detective Wood saw appellant on August 26, 1975, he advised her of her constitutional rights under the Miranda
decision and presented her with a waiver of rights form. She read the form but she refused to sign it. However, she did make a statement to Detective Wood and that statement was taken down by Detective Wood and later after returning to Montgomery, he dictated the statement from his notes into a tape recorder which was subsequently transcribed.
There was a voir dire hearing out of the presence and hearing of the jury to determine the voluntary character of the confessory statement and much testimony was taken on this issue. It was shown at this hearing that Detective Wood did advise appellant of her constitutional rights before interrogating her and it was further shown that there were no promises, threats, hope of reward or other inducements held out to appellant to get her to make a statement. The Court ruled that the appellant's statement was voluntary and that it could be read into evidence from the transcription taken from the tape recorder. The statement is as follows:
 "A. In regards to her participation in the Southside Drugs, she stated that her and Bo-bo, which is Crochet, Nicostro and Dian Kimbrough, which is the sister of Crochet, came to Montgomery. And that they came in Larry Jones's automobile which is the uncle of Bo-bo. She stated that they got to Montgomery some time after midnight and they drove around for a while, and first went to Johnny Johnson's house. She said to see about a stereo that belonged to Crochet. She stated that he was not at home and they went by another house trying to locate a Bruce Turner, and could not find him either. They then went on to the Diplomat Inn and her and Dian went inside the Motel and got a room, 203. That they all went in and went to sleep, and they all *Page 452 
got up the next morning. She stated that Nicostro and Crochet left and came back around eight, and at this time she left and went with them. She stated that they first went to Norman Bridge Drugs and they sent her in to look around and see how many people were in the store. She stated that one man was in the back putting up things on the shelf, and she looked around and saw they had TV cameras, and that there were two other people in the store other than the subject in the back putting stock on the counter. She stated that they went back and told Bo-bo that they had the TV cameras and there were three people in the store, and they went to look at another store. He then drove to Southside Drug and that Bo-bo said that he would go in. She stated, when they got to Southside Drug they drove around a while and then Bo-bo drove the car behind the store and came back to the front and parked near the Delchamps Store next to the curb. And she slid over under the wheel and they left the motor running. She stated that they stayed in the store about thirty minutes before they actually came out and got into the car. She stated that Crochet put the drugs in a pillow case that they took from the Diplomat Motel and they took the drugs to Birmingham in the same pillow case. She stated that when Bo-bo and Nicostro ran out of the store that she drove off and went across a bypass and turned right and drove up the service road and back to the motel. She stated, on the way to the motel that Nicostro and Crochet got in the car and Crochet laid down in the back seat, but Bo-bo kept getting up and looking around. And when they got to the motel they went to the door and knocked on the door several times, and had to bang on the door several times to get Dian to come and open the door, as she was asleep. She stated that they were afraid someone was going to call the police to them, so when they got Dian to the door that she went down and rented another room; she thinks, 200. And that her and Crochet went to this room with the drugs and that her — went to the room with these drugs, and that her and Crochet then went to sleep and did not wake up until midday. She stated that Crochet called Birmingham and talked to Gross and got him to come after them in Montgomery, and Gross did come. And her and Dian drove the car belonging to Larry Jones, which was a black over green Buick, back to Birmingham, and that Bo-bo, Nicostro and Gross came back later behind them."
Appellant testified in her behalf and according to her testimony she, another girl, and two boys left Birmingham, Alabama, on August 18, to attend a rock festival or rock concert at the coliseum in Tuscaloosa and did not get back to Birmingham until August 20, 1975. She gave the names of the two boys and girl that accompanied her to Tuscaloosa where she claimed they registered at the Holiday Inn. She repudiated the confessory statement that she had given to Detective Wood in its entirety and stated that she did not come to Montgomery with the two men and the girl mentioned in her statement and that she did not drive the automobile from the Southside Drug Store nor in any other manner participate in the robbery.
She further testified that at the time she was interviewed by Detective Wood she was intoxicated from the use of narcotics, that the statements made were those made by the officers telling her what she did, and that these statements were not in her own words.
According to her testimony two of the people who allegedly accompanied her on August 18, 1975, from Birmingham to Tuscaloosa were present in the witness room during her trial but neither of them was called as a witness in her behalf to support her alibi. She was the sole and only witness to testify in her behalf.
The sufficiency of the evidence is not presented to us on this appeal. There was no motion to exclude the State's evidence; there was no request for the affirmative charge; there was no motion for a new trial; and no exceptions were reserved to *Page 453 
the oral charge to the jury. Fincher v. State, 55 Ala. App. 676,318 So.2d 371; Jones v. State, 55 Ala. App. 466, 316 So.2d 713;Bass v. State, 55 Ala. App. 88, 313 So.2d 208; Hurst v. State,54 Ala. App. 254, 307 So.2d 62; Mosley v. State, 54 Ala. App. 59,304 So.2d 613.
It is permissible for a deaf-mute to testify against the objection that the party against whom such testimony is given will be put to great disadvantage in cross-examination to test the deaf-mute's credibility.
In Burgess v. State, 256 Ala. 5, 53 So.2d 568, the Supreme Court said:
 "It is well settled by modern authority that it is permissible for such witness to testify as against the objections that the party against whom such testimony is given will be put to great disadvantage in cross-examination to test the witness's credibility. 5 Chamberlayne, The Modern Law of Evidence, §§ 3635, 3636; Pruitt v. State, 232 Ala. 421, 168 So. 149. And it is observed by Prof. Chamberlayne in the last paragraph of said § 3636, pp. 5171-72, that: `And though a dumb person may not be educated in the use of signs and can only express assent or dissent by a nod or shake of the head, thus rendering cross-examination difficult, he may nevertheless be permitted to testify, but it is said that his disability may be considered by the jury, as bearing upon the weight of his testimony. That difficulty attends the examination of a deaf-mute is no reason why his testimony should be excluded,', citing Quinn v. Halbert, 1882, 55 Vt. 224; Ritchey v. People, 1896, 23 Colo. 314, 47 P. 272, 384; Rushton's Case, 1 Lea.C.C. 455 (1786); State v. De Wolf, 1830, 8 Conn. 93, 99; Snyder v. Nations, 1840, 5 Blackf., Ind., 295.
 "In determining the qualifications of such witness to testify and the selection and qualification of the interpreter, much must be left to the sound discretion of the trial court who has full opportunity to see and observe the witness, and the interpreter, in the presence and hearing of the interested parties and their counsel, much of which cannot be portrayed on the written pages of the record. Pruitt v. State, supra; 53 Am.Jur. p. 44, § 29."
We, therefore, hold that the trial court did not err in permitting the witness Karen Vance to testify against appellant. Nor was error committed in allowing her teacher, Ms. Gail Woods, to act as the interpreter of her testimony.
Alibi testimony, like all other evidence in a criminal prosecution, is an issue to be determined by the jury. The jury resolved this issue against appellant simply because they did not believe her testimony. Dulaney v. State, 56 Ala. App. 374,321 So.2d 713.
Conflict in the testimony between defendant's alibi and the testimony of the State presented a question for the jury in robbery prosecution. Clay v. State, 52 Ala. App. 272,291 So.2d 364.
For a collection of cases on this issue see Alabama Digest, Criminal Law, No. 739 (1).
It is settled law in this state that a fact may be established as firmly by the testimony of one witness as by the testimony of an entire community. Gray v. State, 38 Ala. App. 508, 88 So.2d 798; Nabors v. State, 82 Ala. 8, 2 So. 357; Smithv. State, 53 Ala. App. 27, 296 So.2d 925; Dulaney v. State, supra.
Where there is legal evidence from which the jury can by fair inference find the defendant guilty, this Court has no right to disturb the verdict. Whether there is evidence of the defendant's guilt is a question of law and its weight and probative value are for the jury. Haggler v. State, 49 Ala. App. 259, 270 So.2d 690; Bolton v. State, 21 Ala. App. 373,108 So. 631; Dulaney v. State, supra.
Appellant argues that prejudicial error was committed when the prosecutor was allowed to question her about taking drugs seven days after the robbery. We do not think the prosecutor exceeded the limits of permissible cross-examination in this instance. It must be remembered that appellant *Page 454 
testified that she was intoxicated from taking drugs at the time she made the statement to Detective Wood. An eyewitness saw appellant in the getaway car at the drugstore where a number of hard drugs were taken during the robbery. The extent of cross-examination is addressed to the sound discretion of the trial court and is not reviewable on appeal except for abuse. We hold there was no abuse of discretion by the trial court under the facts of this case. Bosarge v. State, 273 Ala. 329, 139 So.2d 302.
By the consent of appellant and the attorneys for both sides the jury was allowed to separate during the trial and overnight. Appellant claims that the local newspaper carried a story about the robbery of the drugstore and quoted the trial judge as saying that he was satisfied that Karen Vance would tell the truth. Appellant states that this amounts to the trial judge commenting favorably on the testimony of the State's witness. Appellant's counsel told the Court that at the end of the trial he wanted the court to poll the jury to determine if any member of the jury had read the story and if they were in any way influenced by the news article. After the jury returned its verdict, the Court polled each individual juror with reference to the news report. About one half of the members stated that they had not read the news account and the other members of the jury said they had read the story but were in no wise influenced thereby. In our opinion no error intervened here. United States v. Hyde, 5 Cir., 448 F.2d 815, cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745.
We have carefully searched the record for errors which injuriously affected the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except CATES, P.J., who dissents.