307 So.2d 62

Jimmy Ray HURST

v.

STATE.

7 Div. 273.

Court of Criminal Appeals of Alabama.

Nov. 12, 1974.

Rehearing Denied Dec. 17, 1974.

Bolton, Sizemore & Rumsey, Sylacauga, for appellant.

William J. Baxley, Atty. Gen., and Donald V. Watkins, Special Asst. Atty. Gen., for the State.

HARRIS, Judge.

Hurst was convicted of murder in the first degree and sentenced to life imprisonment. At arraignment and trial he was represented by employed counsel under a plea of not guilty. After conviction he was found to be indigent and he is in this Court with a free transcript. Trial counsel was appointed to represent him on appeal.

At the time of the homicide appellant was a Lieutenant on the Talladega Police Force. The killing occurred on the night of June 4, 1973, on a fire lane in a dense forest about five miles from the city limits of Talladega. Appellant was in charge of the Third Shift with hours from 10:00 P. M. to 6:00 A.M. but was taking his days off at the time of the killing. He was off duty on June 1, 2, 3, and 4.

There was one eye-witness to the murder, a woman of pleasure who was a thirty-year-old divorcee with three minor children under thirteen years of age. She will be referred to only by her first name, "Beatrice". She had been dating both the appellant and the deceased. She freely admitted having illicit sexual intercouse with both men and numerous other men also. Appellant was married but the deceased was divorced.

Beatrice and appellant's wife worked together as waitresses at a private club known as Point Aquarius, located on Logan Martin Lake. They were close friends. Appellant's wife was also dating the deceased and they frequently met at Beatrice's home. They were also seen together at other places by other witnesses. Beatrice knew the deceased carried a photograph of appellant's wife in his wallet. The deceased also carried a photograph of Beatrice and her three children in the same wallet.

The State Toxicologist who performed the autopsy on the deceased removed his wallet and itemized the contents. He found the above photographs and numerous other items including his social security plate bearing his name, a number of receipts in his name, $71.00 in cash, and other items not necessary to mention. The photographs of appellant's wife and Beatrice and her three children were introduced into evidence over the strenuous objections of appellant.

The toxicologist further testified that he removed nineteen (19) pellets from the chest region of the deceased, and they were number six (No. 6) shot. It was his opinion that death resulted from spinal cord trauma or injury, hemorrhage and shock associated with multiple shotgun wounds to the body. It was his opinion that he was shot three times at close range and that death was instantaneous. The body was in an advanced state of decomposition and the head and face were so mutilated as to be unrecognizable.

On Friday, June 1, 1973, appellant called Beatrice and asked her to spend the night with him in a mobile home in a trailer park that was leased to a fellow officer, who also was assigned to the Third Shift. He suggested that she bring her uniform or the clothes she was going to wear on her job the next day. Appellant told his wife that he had to work that night though this was the first of his four nights off duty and he wore his police uniform to deceive his wife. Beatrice drove to the trailer park and waited for appellant. Getral Smith, a police officer who often worked with appellant on the Third Shift, carried appellant to the trailer park in a patrol car, put him out and returned to duty. Appellant had the key to the mobile home and they went in and spent the night together. Appellant was picked up at 5:00 A.M. by Smith and then Beatrice dressed and went to her job at Point Aquarius.

Beatrice did not see appellant again until the following Sunday night though he called her constantly. On Sunday night he called her and asked her to ride around with him. They arranged a meeting place and they arrived in separate cars. Beatrice parked her car and got into appellant's 1964 white Cadillac automobile and they rode around until 11:00 P.M. He carried her back to her parked car and they parted. Appellant did not mention his wife and the deceased to Beatrice on Friday night when they slept together nor on Sunday while they were riding around for several hours.

The deceased made the fatal mistake of bragging about his liaison with appellant's wife and the gossip became rampant. Sometimes it is said that the injured spouse is the last to know but when the gossip becomes wide-spread it is inevitable that the wronged party will pick up the idle rumor circulating in the neighborhood. When appellant learned of his wife's infidelity, he decided to avenge his wounded honor and his wife's name. It surpasses all understanding why appellant was so shocked upon learning that his wife was having a love affair when by his own admission he was guilty of moral degeneracy and had a perverted regard for his own marital status. It may be that the profligate still wants his wife to remain pure even though he continues to be a bounder and libertine.

Beatrice went to work at Point Aquarius on Monday morning, June 4th, 1973. She got off work at five o'clock and was back in Talladega at five-thirty o'clock. She did not go home but went to the Eleventh Frame Night Club to drink beer for about two hours. The deceased was there when she arrived and was still there when she left. While she was at the club, appellant called her and said he wanted to see her and asked her when she was leaving. She told him she was leaving then but she had to go home and carry her children to the ball park. She carried them to a baseball game at the park and left them. When she left the ball park, she drove down South Street and saw appellant at a red light. She turned and headed out the Ashland Highway and turned off on a dirt road that led to an abandoned dump road towards the Stockdale Community. Appellant followed her in his Cadillac. She went on this dirt road for about three miles and stopped. Appellant pulled up behind her. Beatrice had been to this spot many times before as it was one of her favorite trysting places and she had been here several times with appellant and also with the deceased. Appellant got a six-pack of beer from the trunk of his car and he drank four beers and she consumed two.

While they were parked appellant told Beatrice that he had heard that the deceased was having a love affair with his wife; that the deceased was telling everyone about the affair and was laughing about it and appellant said he wanted to know the truth about it. He told her that he wanted to talk to the deceased and let him convince appellant that he had not been going with his wife or make him tell what he had been telling everybody else in town. He further said that he wanted the little ——— ——— ——— ——— to stop laughing at him like he had been laughing at everybody else in town. Appellant asked Beatrice to drive back to the Eleventh Frame Night Club and bring the deceased to him. He told her to bring him to the appointed place hereinabove described. Beatrice did not have the slightest idea that she was to serve as a decoy in an ambush murder case, so she agreed to bring the deceased to appellant in the deep forest.

Beatrice returned to the night club in Talladega and found the deceased. She did not get to have a conversation with the deceased at that time as another one of her lovers was present and was insisting that he spend the night with her in her home that night. She told him that he could not stay with her that night and left the club. She went home and called the deceased on the telephone and asked him to meet her below the Talladega Motel. She drove to the appointed place and he arrived in five minutes in his blue pickup truck. She told him to follow her and he did. She drove to the place pre-arranged with appellant. As she was driving on this dirt road her headlights picked up appellant's white Cadillac parked in a secluded place off the main dirt road with the lights off. She immediately braked her automobile and stopped just past the Cadillac with her lights on bright. She did not see appellant. Just as her car came to a stop, she heard the deceased change gears and start backing rapidly. Then she heard appellant cry out, "Stop your ——— ——— ——— ——— stop." Immediately she heard three shotgun blasts in rapid succession and then two more. She got out of her car and started running back to the truck to see about the man she unwittingly led into a trap. As she got near the hood of the truck appellant walked around the truck and intercepted her, and told her to get in her car and get the hell out from there. She told him she wanted to see the deceased and appellant said, "You can't, I've shot his damned face off." She saw the shotgun in his hand.

Appellant told Beatrice to go home and keep her mouth shut; that if she told anyone both of them would get fifty years. She told him she could not leave as the truck was blocking her way. He told her he would move the truck. He walked to his Cadillac, opened a door and threw his shotgun in his car. He told her to wait for him and got in the truck and backed it down the road out of her sight. He walked back to the scene of the shooting and asked her if she had a flashlight as he wanted to pick up the spent shells he used in killing the deceased. She told him she did not have a flashlight and he asked her to drive him back to town so that he could get one. On the way to town she ran out of gas not too far from her home and parked on the side of the highway. On the way back to town she asked him why he did it and he said he was not sorry.

Appellant told Beatrice that he was going to a telephone and call police officer Getral Smith to bring them a can of gasoline and he left her in her car and she saw him walking in the direction of her home. He returned to her car and stood by the car to await the arrival of Smith. A few minutes later, Smith drove up in a patrol car with a can of gasoline and poured it in her car. Appellant was standing by the side of her car and her windows were down. She heard appellant tell Smith, "I killed the ——— ——— ———. He has been going with my wife all this time, and I ought to go home and kill her, too." Smith told him, "You have done enough." Smith did not place appellant under arrest

nor did he say anything about arresting him. Smith got back in the patrol car and left them.

Evidently appellant got a flashlight from Smith as he asked Beatrice to take him back to his car. She drove him back to the murder scene and he got out. He again told her to go home and stay there and to keep her mouth shut. She left and drove to her home and parked in the driveway. The time was 11:00 P.M. She stayed in her car about ten minutes and went back to the Eleventh Frame Night Club and started drinking beer. She continued drinking until she got completely drunk. Somehow she made it home. Around 2:00 A.M. on June 5th, 1973, appellant came to her home. He drove to her home in a blue Mercury Comet which he also owned. He was mad at her because she had not done what he instructed her to do—stay at home and keep her damned mouth shut. She told him she had not said anything. He further told her that he found and picked up the empty shells and went home and confronted his wife. He said he beat the hell out of her and would have killed her if she had not jumped in the bed with his daddy. He told her to stay away from the Eleventh Frame Night Club and go to work as usual and act like nothing had happened. She continued to work the rest of that week at Point Aquarius and so did appellant's wife. While on the job, appellant's wife showed her and others the bruises on her arms and legs.

Beatrice did not personally see appellant anymore that week until after the body of deceased was found in his shot-up truck on Friday, June 8, 1973, around 1:30 P.M., but he called her constantly to check on her. In addition to this, a police patrol car kept her home under close surveillance every night. On Wednesday afternoon appellant called her and she asked him if the body had been found and he told her to quit worrying and she asked him how she could, that the brother of the deceased and others had called her to inquire if she had

seen him. He told her to keep her mouth shut, that they would find him. She asked him how he could stand it and his reply was, "he didn't care if the buzzards toted him off."

After the body was discovered, Lieutenants Wilby Wallace and Tyler Wood of the Talladega Police Department went to the scene of the killing. Sheriff H. E. Mitchell was there when they arrived. Mitchell told them he was in charge of the investigation and for them to leave and not interview any witnesses. These officers returned to Talladega and went to the Mayor's Office and told him of their conversation with the Sheriff. Suspicion had begun to focus on appellant and Wood was awfully upset. Wood and Wallace left the Mayor's Office and went to Wood's home. The Mayor called appellant to his office and asked him if he killed the deceased and appellant denied any involvement. The Mayor told him that Lieutenant Wood was visibly upset and appellant said he would talk to him and try to placate him. The Mayor called Wood at his home and had a short conversation with him and a few minutes later, appellant called Wood. A few minutes later the Mayor and appellant came to Wood's home in separate cars. The time was between five and six o'clock P.M.

The Mayor did not stay long and after he left appellant turned to Lieutenant Wood and told him that he did not have anything to worry about because they did not have anything on him. Lieutenant Wallace testified that appellant told them "that he had an alibi everywhere that he went that night that this incident was supposed to have happened and went on to tell us that at first he was down to Taylor's Wrecker Service to get a muffler fixed on his car and he left there and rode around a while, killing time, more or less, to wait for his wife to get off from work at Point Aquarius, and he kept riding around, and he said a little later on that night he ran out of gas on the Anniston Highway in his car. And (he) called

down to the Police Station and Getral Smith brought some gas out there to him, and he put the gas in his car and rode around again until his wife got off work down at Point Aquarius and then he said he went home and went to bed."

It is of special note that appellant did not tell Wood and Wallace that he was in Beatrice's car with her on the Anniston Highway when her car ran out of gas, but told them he was alone in his car when he ran out of gas. It is also of special interest that he was telling the officers that he had an alibi for the night that the deceased was killed when none of the officers he was talking to knew what night he was killed.

Around six-thirty Friday afternoon, Lieutenant · Wood and Patrolman Getral Smith went to Beatrice's home to interview her as to her knowledge concerning the death of the deceased. The interview lasted nearly two hours during which time both officers made notes of the conversation with her. They did not ask her to sign the statements they wrote. She did not tell these officers that appellant shot and killed the deceased in her presence. Before they left they gave her some instructions.

Appellant called Beatrice Saturday morning and asked her if she was going to work that day. She told him she did not feel like working and he asked her to meet him and suggested two different places. She refused to meet him at these places and he then suggested the Riverside Restaurant on Logan Martin Lake in St. Clair County and she agreed to meet him there. She arrived about five minutes before he did. They went into the restaurant and got a table for two. He told her he sent Lieutenant Wood and Getral Smith to her house Friday night to see how she was holding up. He ordered breakfast for both of them. He ate his food but she could only swallow coffee. He told her she had obeyed the instructions given her by Wood and Smith but told her she did not have to

say anything to anybody else. He said if anyone else came to see her to tell them she had already given a statement, and that if she needed a lawyer he would get her one later.

He further told her that he was going to get the —— —— —— that put the finger on him and he was referring to the man who found the body, Jimmy Roberts, and Jerry Gaither, one of Beatrice's lovers of four years standing. He said both men had told the Sheriff's Department to get themselves a policeman. Roberts operated a service station and appellant said it would be easy for him to pick him off as the service station was well-lighted. He told her that Getral Smith was going to take care of Gaither. Smith had previously threatened to get Gaither when he left Beatrice's house as he was always there when appellant wanted to be with her himself.

Beatrice asked appellant how he could stand it knowing that he had killed somebody and he said it did not bother him. He told her the Mayor told him if he did it he would give him money to get out of town or out of the country. She told appellant that she could not stand it any longer, not telling somebody. He told her not to do anything to herself, that he wanted to do it for her, to make it easier for her. He told her he would use something that could not be traced, like a shotgun or an ice pick between her green eyes. In short he told her if she could not stand it any longer, he would help her end it. As they were leaving, he put his hand on her shoulder and bent over and kissed her on the cheek.

Beatrice did not go home that day until 6:00 P.M. but spent the day with a girlfriend. Shortly after she got home, a girlfriend came to spend the night with her. A few minutes later Sheriff Mitchell and Lt. Roy Riddle came to interview her. Appellant was watching Beatrice's home periodically and he discovered the Sheriff's car parked in her driveway. He called to talk to Beatrice. She had a telephone in

her bedroom and an extension in the kitchen. She indicated to the officers that the caller was appellant and the Sheriff listened with her in the bedroom and Lt. Riddle listened on the kitchen extension. Appellant asked her if she had company and she said that she did. He asked if she was all right and she told him she guessed she was. He told her to get them to leave and she said she would try and the conversation ended. Forty-five minutes later appellant called again and the officers listened in the same manner and both officers took notes on both calls. On the second call appellant asked her if they had gone and she said that they had not. He said to tell them to get the hell out of there, that she did not have to talk to them and to tell them she had her rights. He further told her to get a lawyer, but to tell them to leave and she told him she would try. A few minutes later she got a third call but it was appellant's wife and the officers did not listen to this conversation.

Beatrice then told the Sheriff and Lt. Riddle everything she knew concerning the events leading up to and culminating in the killing. The officers carried her to the home of the District Attorney and she told him the whole story. A warrant was issued for the arrest of appellant charging him with murder. Appellant was on duty that night and the Chief of Police was notified that the Sheriff was ready to execute the warrant and the Chief brought appellant to the Sheriff's office. The Sheriff put him in jail.

After appellant was placed in jail, officers of the Sheriff's office got three shotguns from his home. Two of them had not been used recently but the twelve gauge automatic shotgun had been recently cleaned and still had oil on the barrel and the barrel was cleaned.

Getral Smith was a close personal friend of appellant's. They were patrolling companions while they were employed by the Anniston Police Department for a number of years. When appellant was employed by the Talladega Police Department he was instrumental in persuading the Mayor of Talladega to hire Smith to work with him on the Third Shift. Notwithstanding that the Sheriff had told Lieutenant Wood and Patrolman Smith that he was in charge of the homicide investigation and for them to leave the scene of the killing and not interview any witnesses, they ignored the Sheriff's instructions and continued to be active in the investigation. On Friday night after the Sheriff's investigation began to focus on appellant, he assigned Smith to the case. When some question was raised about this assignment, Smith went to the Mayor and requested that he be assigned to the case. He told the Mayor that if he was not assigned he would resign or take a leave of absence and continue the investigation as a private citizen.

In the aftermath of the murder of a private citizen by a Police Lieutenant of the Talladega Police Department, it became evident that the Mayor, Police Chief, and other officers of the Police Department, particularly Getral Smith, were engaging in a small scale "Watergate Cover-up". As a result, the Mayor resigned, the Chief of Police was forced out of office, and Smith was suspended and subsequently indicted as an accessory after the fact.

The Police Chief and Lieutenant Wood did not testify in the case. The Mayor and Getral Smith were summoned as witnesses for the defense. The Mayor was sworn and took the witness stand. He immediately invoked the Fifth Amendment and declined to testify on the ground that his testimony might tend to incriminate him. His lawyer was in court and objected to him testifying but the trial judge required the Mayor to personally invoke the privilege and he did so.

Smith waived his privilege against self-incrimination and testified in behalf of appellant. He admitted that he carried a can of gasoline to appellant and poured it into Beatrice's car. He denied that appellant

told him in Beatrice's presence that, "I killed the —— —— —— ——. He has been going with my wife all this time, and I ought to go home and kill her, too." He said he and appellant just had some small talk and he left them and went back on duty. Smith did not tell anyone in authority that he carried gasoline to Beatrice's car on the Anniston Highway the night of the homicide and that appellant was in the car with her until appellant made the statement to Lieutenants Wood and Wallace that he had an alibi for Monday night and that Smith brought him gasoline for *his car.*

There was considerable testimony about appellant's movements and activities on the night of the homicide and into the wee hours of the morning. To relate further details would only serve to extend this already lengthy opinion.

Appellant filed three pre-trial motions, (1) motion to produce, (2) motion to quash the indictment, and (3) motion for change of venue alleging that he could not get a fair and impartial trial in Talladega County due to wide-spread publicity in newspapers and other news media.

■ The motion to produce was a "scatter-gun" motion seeking to have the District Attorney to open wide his files for an unlimited excursion therein. The motion sought, inter alia, (1) any and all confessions or statements in writing purportedly written, signed or executed by the defendant, (2) all instruments, devices, guns, or other physical things used in the homicide, (3) all photographs, pictures, maps or drawings to be used and introduced in evidence, (4) all reports and documents in writing in possession of the State pertaining in any way to the death of the deceased and connecting the defendant with his death, (5) all statements reduced to writing by the investigating officers from any witnesses purportedly connecting the defendant with the homicide, (6) any and all oral statements made to the officers by defendant whether they be conversations which he had on the telephone and over-

heard by the officers, and (7) any and all materials, pictures, photographs, guns, drawings, physical instruments of any nature, statements in writing, recordings, or any other things of any nature in the possession of the officers that would, in any way benefit the defendant in his defense and, particularly, any of the above described items that would tend to point toward the guilt of any other person or persons guilty of taking the life of the deceased.

During the oral argument on this motion, counsel for appellant contended that appellant's telephone had been illegally tapped. This information was most disturbing to the judge and he wanted to take testimony on this issue. The Sheriff was sworn and testified that he and Lieutenant Roy Riddle, State Investigator, were the only two officers officially in charge of the investigation and that he personally had not engaged in any form of wire-tapping and, to his knowledge, neither had Lieutenant Riddle. Lieutenant Riddle was not in court during the hearing of this motion. He was in Anniston, Alabama. The judge instructed the Sheriff to contact Riddle and have him to call the judge's chambers. When the call came through the judge got appellant's counsel to get on the extension and listen to the conversation. Riddle told the judge that he had not tapped appellant's telephone lines and had no knowledge of anyone else engaging in any wire-tapping. This matter was put to rest.

The Sheriff further testified that appellant made no statement, oral or written, concerning the homicide. The motion to produce was overruled and denied.

There was no error in overruling and denying the motion to produce. McCants v. State, 282 Ala. 397, 211 So.2d 877; Smith v. State, 282 Ala. 268, 210 So.2d 826; Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666.

■ No proof was offered in support of the motion to quash the indictment on the

ground that there was no legal evidence presented to the Grand Jury to authorize finding the indictment charging appellant with murder in the first degree. The motion was properly overruled. Sparks v. State, 46 Ala.App. 357, 242 So.2d 408.

No testimony was had in support of the motion for change of venue. Numerous newspaper accounts of the homicide and the arrest of appellant were introduced by the defense. The state countered the accounts and stories in the newspapers with seventy-four (74) affidavits of various citizens of Talladega County to the effect that appellant could get a fair and impartial trial in that County. Many affiants stated they knew both appellant and the deceased. Some knew appellant and not the deceased. Some knew the deceased and not appellant, and some did not know either.

Appellant moved for a continuance to afford him an opportunity to get witnesses to support his motion for change of venue. The court gave counsel some twenty-eight (28) hours to obtain supporting affidavits or witnesses and counsel told the court that was insufficient time as he had a court trial in another county the next morning and he did not know how long that case would last.

Appellant was given a preliminary hearing in July, 1973, preceding the trial in chief in October. This hearing lasted two and a half days and was reported by the official court reporter. Appellant's astute, resourceful and aggressive counsel made full use of this hearing as a discovery process and made beneficial use of the transcribed testimony in cross-examining the state's witnesses. He was thoroughly familiar with the state's case against his client as is shown by his trial tactics in the multi-volume record before us. He had ample time from the time he was employed after appellant's arrest until October 1st to secure affidavits or witnesses to support the change of venue motion.

The motion for change of venue was overruled. In this there was no error. The burden is on the defendant seeking a change of venue to show, to the reasonable satisfaction of the court, that he cannot receive a fair and impartial trial. Such motions are addressed to the sound discretion of the trial court and will not be disturbed on appeal except for gross abuse. Payne v. State, 48 Ala.App. 401, 265 So.2d 185; Mathis v. State, 280 Ala. 16, 189 So.2d 564; Moore v. State, 52 Ala.App. 179, 290 So.2d 246.

Publicity by the press, radio and television does not necessarily constitute ground for change of venue. Payne v. State, supra; Mathis v. State, supra; Mathis v. State, 52 Ala.App. 668, 296 So.2d 755; Whitehurst v. State, 51 Ala.App. 613, 288 So.2d 152.

Likewise, a motion for a continuance is addressed to the enlightened discretion of the court and will not be reviewed in the absence of gross abuse. No error intervened here. Cagle v. State, 211 Ala. 346, 100 So. 318; 6 A Ala.Dig., Criminal Law, ⊷ No. 586.

Appellant urges that reversible error was committed by the District Attorney on cross-examination of Getral Smith as follows:

"Q. I'll ask you as a matter of fact (if) Tyler Wood on that occasion and in your presence say to Beatrice (————) this or this in substance. - - - - - -

"MR. BOLTON: (interrupting) We object to that, that is hearsay to my client.

"THE COURT: Overruled.

"Q. Said: If you put the noose around Jimmy Ray Hurst's necks I will personally kill you.

"A. Necks! How many has he got?

"Q. Well, neck.

"A. No, sir, I didn't hear any such statement."

■ A negative answer to an improper question does not constitute reversible error. Stephens v. State, 250 Ala. 123, 33 So.2d 245; Leonard v. State, 36 Ala.App. 397, 58 So.2d 138.

■ Photographs of the deceased and the *locus in quo* are admissible in murder prosecutions when they shed light upon the character and location of the wounds on the victim's body and when the proper predicate has been laid. Snow v. State, 50 Ala.App. 381, 279 So.2d 552; Boulden v. State, 278 Ala. 437, 179 So.2d 20.

■ The rule is stated in McKee v. State, 253 Ala. 235, 44 So.2d 781, as follows:

"* * * The art of photography is generally relied on for depicting the resemblance of persons, objects, things, and places and when verified by evidence, extrinsic of the photographs, going to show that they correctly depict the thing or object *at the time they were taken*, photographs are admissible in evidence in a criminal prosecution, if they tend to shed light on, strengthen or illustrate the truth of other testimony offered by the prosecution. * * *" (emphasis supplied)

■ There was no error in admitting photographs of the deceased taken at the scene of the homicide five days after he was killed. Concededly, these photographs are unsightly—even ghastly. However, gruesomeness is not ground for excluding evidence consisting of photographs if it has a reasonable tendency to prove or disprove some material fact in issue, or which at the time appeared to be probably in dispute or material, and if it illuminates the issues in any way, and is relevant, it is admissible even though possessing a tendency to inflame the minds of the jury. McKee v. State, 33 Ala.App. 171, 31 So.2d 656; Grisset v. State, 241 Ala. 343, 2 So.2d 399; Wilson v. State, 31 Ala.App. 21, 11 So.2d 563; Harnage v. State, 49 Ala. App. 563, 274 So.2d 333, (reversed on other grounds, 290 Ala. 142, 274 So.2d 352).

■ Appellant objected to the introduction into evidence of the photograph of his wife which was found on the body of the deceased. Appellant's counsel stipulated that the photograph was the wife of his client. Evidence of intimate relations between deceased and appellant's wife together with the photograph was properly admitted as going to show the motive for the homicide. Pate v. State, 94 Ala. 14, 10 So. 665.

Appellant claims reversible error was committed by the District Attorney in his closing argument to the jury. From the record:

"Mr. Hollingsworth: And let me ask you this while I am on that. I wonder why that you didn't hear it from Jimmie Faye Hurst about these bruises. Why that she jumped in the bed with her daddy-in-law to keep him from whipping her. In all these things you heard, why didn't you hear from that?

"Mr. Bolton: Your Honor, my client has no control over any separation or any thing else involved and I object to it. It is illegal argument.

"The Court: Are they still married?

"Mr. Bolton: Yes, sir, they are still married.

"The Court: I'll overrule."

Beatrice had testified that appellant told her that after the killing he went home and beat the hell out of his wife and he would have killed her if she had not jumped in bed with his daddy.

■ It is the general rule that one party may not comment unfavorably on the other party's failure to produce a witness supposedly favorable to that party if the witness is equally available to both sides.

We are not of the opinion that the doctrine of equal availability can be. applied to close-blood relationship or the relationship of husband and wife. Morgan v. State, 49 Ala.App. 330, 272 So.2d 256; Commonwealth v. Spencer, 212 Mass. 438, 99 N.E. 266; 16 C.J. 904, Section 2250; 14 Am.Jur. 875, Section 151.

Where the affirmative charge was not requested, no motion to exclude the state's evidence was made, no exceptions were reserved to the oral charge and where there was no motion for a new trial, the only matter presented for review is the rulings of the trial court on the admission or rejection of evidence offered at trial. Eady v. State, 48 Ala.App. 726, 267 So.2d 516; Grant v. State, 46 Ala.App. 232, 239 So.2d 903; Robinson v. State, 46 Ala.App. 684, 248 So.2d 583.

We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.

Affirmed.

All the Judges concur.