HARRIS, Judge.
Appellant was convicted of murder in the first degree and sentenced to life imprisonment in the penitentiary. In the presence of retained counsel at arraignment he pleaded not guilty and not guilty by reason of insanity. After conviction he gave notice of appeal and requested a free transcript. He was determined to be indigent and was furnished a free transcript. One of appellant’s counsel was appointed to represent him on appeal.
The evidence in this ease is in sharp conflict. Only a jury could unscramble the conflicting testimony and arrive at a verdict.
On Sunday, April 25, 1976, appellant shot the deceased while the deceased was in his car parked in front of 234 Mildred Street, in the City and County of Montgomery, Alabama. This address was the home of appellant’s mother.
On the afternoon of April 25, 1976, the wife of the deceased went to 234 Mildred Street and saw her husband’s car parked there. She was taken there in a car driven by a cousin. She knocked on the door and asked if her husband was there and was informed that he was inside. She entered the house and talked to her husband for ten or fifteen minutes. During this period he pulled $30.00 out of his pocket and gave it *767 to her. He then took out his wallet and showed her that he had $150.00 left. According to the wife her husband had seven $20.00 bills and two $5.00 bills. She left her husband at this Mildred Street address and she saw him again that same afternoon at a local hospital. He had sustained two gunshot wounds to his head. He died in the hospital and the next time she saw him he was in a casket at a funeral home. She was shown two photographs of her husband taken at the funeral home and she identified them as her husband. They were introduced into evidence over appellant’s objections.
She further testified that present in the house when she was there were appellant, his mother (Clara Mae Porter), A1 Peterson, Eddie Holt, Jim Clark, Debora Harris, her husband, and several others whom she did not know. She stated that appellant and his mother were playing the piano and the others were sitting on the sofa drinking and playing cards.
Police Officer George Roger Owens of the Montgomery Police Department was the first officer to arrive at the scene to investigate the shooting. He stated that he arrived at approximately 3 o’clock in the afternoon and found a black male in a Buick automobile slumped over the front seat and that his arms were dangling to the rear seat of the four-door car. He said the trunk of his body was still under the steering wheel and his right foot was right over the gas pedal but a little higher than the gas pedal. He said that his left foot was twisted around a little further. He found a small Barlow knife in the back floorboard of the automobile. He identified this knife and it was introduced into evidence.
Officer Owens further testified that the paramedics arrived and he removed the billfold from the shot man as they were putting him on a stretcher to transport him to the hospital. There was no money in the billfold but he found a cheek stub on the right side of the car where the right door would have opened that had the name of the deceased, Aaron Davenport, on it.
The officer talked to people around the car and on the porch and could not get any information as to what had occurred. Everyone there said they did not see anything and did not know anything. While the officer was trying to get some information appellant came walking up Mildred Street, and at this time he was not a suspect. The investigation had not focused on appellant, but appellant started to make a statement.
At this point a voir dire hearing was had out of the presence and hearing of the jury at the request of appellant’s counsel. The officer testified in answer to counsel’s questions that he had talked to appellant’s mother and sister there at the house and several other people there at the scene and they would not tell him anything. They said they didn’t see anything. He stated that he then saw appellant walking up to him and he spoke to appellant.
From the record:
“Q. Do you know him?
“A. Yes, sir.
“Q. You also knew that he had a record?
“A. Well, yes, sir. I knew he was in the County Jail at the time.
“Q. What did you say to him?
“A. I asked him if he could help me. I couldn’t get any information from any of the people there at the house.
“Q. And what did he say back to you?
“A. He said he would tell me one truth if I would tell him one.
“Q. Tell him one what?
“A. He said, ‘If you will tell me a truth, I’ll tell you one.’
“Q. And then what did he say?
“A. I said, ‘That’s fair enough.’ He asked me if there was a knife in the automobile, and I told him that there was. And he said, ‘Well, I shot him.’
“Q. Let me ask you about the knife; was it open when you found it?
“A. Yes, sir, it was.”
Back before the jury the State proved the substance of the above quotation.
Clara Mae Porter was called as a witness for the State. She testified that appellant was her son and that she had known the *768 deceased five or six months. She said that the deceased came to her home on the day he was shot around 3 or 4 o’clock in the afternoon and he came with A1 Peterson, Eddie Holt and her son. She stated that her mother, daughter, Arthur Billingsly, Jim Clark and George Paul McGee were present when the others arrived. She stated that they were sitting around having fun, drinking and playing cards. She said the deceased was drinking and appellant had a beer. She stated that all of them were drinking but she was paying strict attention to her son because she “knew that he was already in trouble. That’s- why I was paying attention to him.”
Counsel for appellant' objected at this time to the question, “Oh, he was already in trouble . . . ” but the objection was overruled by the Court saying, “That’s part of the res gestae, as I understand it.” There was further mention of the fact that appellant was already in trouble, but the Court sustained appellant’s objection.
Counsel for the prosecution asked appellant’s mother if he was living with her on April 25, 1976, and she replied that he was not. Then she was asked where he was living at that time and she replied, “He was living at the County Jail at-that time.” Appellant’s counsel then moved for a mistrial and the motion was overruled.
This witness further testified that the wife of the deceased came to her home and had a conversation with him and the deceased gave her some money but she didn’t know how much he gave her, and she didn’t know if he had any more money left after giving his wife some money. She stated that, after the wife of the deceased left her house with the money he had given her that the deceased sat on the sofa between A1 Peterson and her son. The deceased dozed off and slept for fifteen or twenty minutes and while he was asleep her son got up and went to the back room to the bathroom. She further testified that he awoke and started cursing her son and accusing him of taking his money; that the deceased told appellant that he knew he had taken his money and he threatened to kill him. Appellant returned to the room and told the deceased that he did not take his money.
Clara Mae Porter continued to testify that the deceased began using obscene language and threatened to kill appellant several times. A1 Peterson and Eddie Holt carried deceased outside on the porch but that the deceased returned with a knife in his hand and again threatened to kill appellant. She said she did not see anyone take the deceased’s money.
On cross-examination she testified that the deceased stood in the hallway between her living room and dining room with an open knife in his hand and told appellant that he was going to kill him and at this point she ordered the deceased to leave her house.
George Paul McGee testified that when the shooting took place he was on the porch and had been on the porch for about 30 minutes. He stated that he did not hear any argument inside the house. He said the deceased left the house and walked down the steps with witnesses Peterson and Holt and he had a knife in his hand at that time. He said, that five to ten minutes later appellant came out of the house and walked towards the car and at this time the deceased made a break to get out of the car with the knife in his hand. He stated that the deceased had one foot on the ground with the knife in his right hand and had his left hand on top of the car. He could not testify whether the deceased ever got completely out of the car, but at the time he attempted to appellant was standing on the sidewalk six or seven feet from the automobile and had a gun in his hand. He said he looked off and heard a shot or two and when he looked around he saw the deceased slumped over the seat with the knife still in his hand.
On cross-examination he stated that the deceased was in the front seat of the ear under the steering wheel and that the driver’s side was next to the sidewalk. He stated that when appellant came out of the house and walked by the automobile the deceased started out of the car with a knife in his hand. He said there was an argu *769 ment at the car between the deceased and Eddie Holt and A1 Peterson. He heard the deceased say he was going to kill appellant.
Jim Clark testified to substantially the same facts as witness McGee, but he did not see anyone take the deceased’s money while he was asleep on the sofa between appellant and A1 Peterson. He said when they got the deceased to his automobile he got in the car and sat down but had one leg hanging out of the car. He also stated that the deceased had been drinking but he did not seem to be drunk.
A1 Peterson testified that he lived at 438 Caroline Court and that he had known the deceased about two years before his death; that he first saw the deceased on April 25, 1976, around 9:00 a. m. He said they were with some other individuals including Eddie Holt, and they were joined by appellant later that day. They went to the appellant’s mother’s home and they were drinking. He stated that he, appellant and the deceased sat on the sofa with the deceased in the middle. He said he dozed off the the next thing he remembered hearing was a statement by the deceased that appellant had clipped him. He didn’t know whether appellant clipped the deceased or not while both of them were asleep.
Peterson further testified that they persuaded the deceased to “get up, and let’s go.” He said that he wanted to break up the argument and he, Eddie Holt and Jim Clark all went to the deceased’s car. They got in the car and the deceased was sitting under the steering wheel. He stated that he got in the back seat and that Clark was on the passenger side in the front seat. His door was closed and he thought all doors to the car were closed. The next thing he heard was some shots and the deceased was in the car when he got shot and he was sitting down. He denied they had to scuffle with the deceased to get him in the car. He further stated that after the deceased was shot he slumped over the back seat and he got out of the car and went home. He said that at the time the deceased was shot he had a knife in his hand.
Detective Roger D. Boothe testified that he was assigned to investigate the shooting involving the death of Aaron Davenport. He stated that when he arrived the paramedics were putting Davenport on the stretcher. The car was empty and he looked in the back of the car and saw an open knife on the floorboard of the passenger side in the back of the car. He made a close inspection of the car and found that the door on the driver’s side would not open from the inside.
Boothe further testified that while he was at the scene of the shooting Officer Owens came up and had appellant with him. He asked Owens what happened, and Owens said, “I think you need to talk to Chrissell Hamilton.” Boothe stated that he talked to appellant briefly at the scene. Thereupon the prosecutor made known to the Court that he wanted to take this matter up outside the presence of the jury and the jury was excluded from the courtroom.
During the voir dire hearing it developed that Boothe gave appellant the Miranda rights and warnings at the scene of the shooting. After advising appellant of his constitutional rights appellant said he understood his rights and Detective Boothe asked him what led up to the shooting. Appellant told Boothe at the scene that Davenport accused him of taking some money and pulled a knife on him and he shot Davenport. Boothe asked him where he got the gun and appellant said that a boy came walking up the street with a gun in his hand and that he snatched the gun out of the boy’s hand and shot Davenport and then threw the gun back and he didn’t know who had the gun. After appellant made this statement to Detective Boothe he was carried to police headquarters and given his constitutional rights again. Boothe gave him a waiver of rights form which he read and signed. This form is as follows:
“City of Montgomery, Alabama; Department of Police; Name, Chrissell Hamilton, Jr., Black male, age twenty-five; place, Detective Division, Montgomery Police Department; date, 4/25/76; time, 6:40 p. m.; charge, assault to murder. *770 “ ‘Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the court will appoint one before we question you. If you want to answer questions now, you can do so, but you can stop answering at any time.’ And I signed that, Officer R. D. Boothe. “The next part: T fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.’ And it is signed by Chrissell Hamilton, Jr.”
Boothe further testified that after appellant signed the waiver form he questioned him further. He stated that he did not apply any physical force to appellant to get him to make a statement and no one in his presence did. He said that only he and appellant were present in the interrogation room. Boothe said appellant was not threatened in any manner; that no promises were made to him and no hope of reward or other inducements were held out to him to get him to make any statement. This was followed by a question and answer interview which was reduced to writing. It reads as follows:
“ ‘4/25/76; 6:45 p. m. This is the statement of Chrissell Hamilton, Jr., concerning the shooting of Aaron Davenport in front of 234 Mildred Street on 4/25/76 at approximately 3:00 p. m.
“ ‘Q Did you see Aaron Davenport on this date?
“‘A Yes.
“ ‘Q Did you and Davenport get into an argument concerning some money that he said that you had stolen from him while he was asleep?
“ ‘A It wasn’t an argument. He just indicated that me or A1 had taken his money.
“ ‘Q Did you shoot Aaron Davenport twice in the head?
“ ‘A I shot twice. I don’t know where they hit.
“ ‘Q Did you intend to kill Aaron Davenport?
“ ‘A Yes, I did.
“‘Q Why?
“ ‘A He had a knife and I didn’t know what he would have done if he had the chance.
“ ‘Q Where was Davenport when you shot him?
“ ‘A Advancing on me from his car.
“ ‘Q Was his feet on the ground or in the car?
“ ‘A He was standing outside his car with one hand on the door and a knife in the other.
“ ‘Q Did Davenport ever try to cut you?
“ ‘A I don’t know what his intentions were.
“ ‘Q What kind of gun did you have?
“ ‘A A .22 caliber.
“ ‘Q Where did you get this gun?
“ ‘A I snatched it out of this boy’s hand.
“ ‘Q Who was this boy?
“ ‘A I don’t know. I just know him when I see him.
“ ‘Q Where is the gun now?
“ ‘A I wouldn’t know if he hasn’t got it. “ ‘Q Who did you give the gun to?
“ ‘A I don’t know him by name.
“ ‘This statement is true and correct to the best of my knowledge.’ And I signed it and Chrissell Hamilton, Jr. signed it.”
On cross-examination Boothe was asked if appellant did not later come back to him and state that a part of the statement was incorrect; that he had actually lied to him and wanted to straighten matters out. Boothe replied that appellant did not voluntarily return to him to straighten anything out but that he interviewed him again. Appellant told Detective Boothe on this occasion that he had his pistol in his pocket all day that day. He had been gambling and he had brought the pistol back and had put it up until he and Aaron started arguing *771 again, and he went and got the pistol back again.
Back before the jury .the proper predicates were laid and the waiver of rights form and the confessory statement were introduced into evidence and read to the jury.
Boothe further testified that two days after the shooting and after Hamilton had given him a confessory statement he went back to the jail and talked to appellant again. Appellant told him the gun was in his mother’s house and if he would let him call his mother he would tell her to give him the gun. Boothe let the defendant call his mother in his presence but the defendant did not tell his mother to surrender the gun to the officer.
Detective Boothe went to appellant’s mother’s home and saw the gun on the table and he picked up the gun. The gun was empty and he told her he needed everything that had been removed from the gun. The mother told one of the small children present to go and get the bullets. The child returned with four live cartridges and two spent hulls and gave them to the officer. The officer later fired one of the cartridges to see if the pistol would fire. The pistol, the live cartridges and the three spent cartridges were introduced into evidence without objection. The waiver of rights form and the confessory statement previously read to the jury were then formally introduced into evidence over appellant’s objection that they had already been read to the jury. The objection was overruled.
The State rested and appellant made a motion out of the presence and hearing of the jury to exclude the State’s evidence on the first degree murder charge saying, “The State has failed to make a prima facie case of first degree murder.” This motion was overruled.
The appellant called Willie Mae Davenport and attempted to prove the deceased had been convicted of various crimes. The State objected and the objection was sustained by the Court who advised counsel, “There is higher and better evidence than that.” The Court was referring to certified copies of judgments of convictions. Appellant’s counsel persisted saying he wanted to test her recollection but the trial court sustained the State’s objection.
The defense then called two witnesses who restated the facts brought out by the State on direct examination concerning the threats made by the deceased to kill appellant because of the money he had taken from him while he was asleep on the sofa between appellant and Peterson. One of these witnesses was appellant’s sister and her testimony was somewhat at variance with the testimony of the other witnesses.
Appellant did not testify.
The trial court charged the jury on all four degrees of homicide. He also gave the jury all of appellant’s written charges — fifteen in number. The Court refused appellant’s request for the affirmative charge. He also charged the jury on the law of self-defense.
In Young v. State, 283 Ala. 676, 220 So.2d 843, 847, the Supreme Court held:
“Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the State’s evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error.”
It is not within the province of the Court of Criminal Appeals to pass judgment on the truthfulness of conflicting evidence. May v. State, Ala.Cr.App., 335 So.2d 242. Ala.Dig.Crim.Law, 1159.3(1).
Appellant claims reversible error was committed by the prosecutor in making reference to prior arrests of appellant. The record does not support this contention. Appellant’s mother volunteered on direct examination that he was living at the County Jail at the time he shot the deceased. The prosecutor did not mention the word “arrest”, nor was there a reference made to a prior conviction of appellant. The question as to where appellant was living was a proper subject of inquiry. The responses *772 made by the appellant’s mother were not direct references to appellant’s bad character but were only incidental in explaining the witness’s attentiveness or defendant’s place of abode at the time of the shooting. If appellant’s counsel had perceived that the mother’s responses tended in any manner to reflect on appellant’s character he should have moved the Court to exclude her answers. This he did not do. Under the holding in Chicarella v. State, 39 Ala.App. 22, 93 So.2d 802, we do not think reversible error was committed.
In Willingham v. State, 261 Ala. 454, 74 So.2d 241, 244, the Supreme Court observed:
“Where a question which does not manifestly call for incompetent testimony but the answer itself discloses the incompetency, the remedy is by a motion to exclude.”
In Brown v. State, 21 Ala.App. 371, 108 So. 625, this Court stated the law to be that, where accused’s objections to questions were overruled but he made no motion to exclude the answers, he waived their admissibility.
Instead of making a motion to exclude the statement of appellant’s mother that he was living in the County Jail counsel made a motion for a mistrial. This motion was denied, and properly so. Shadle v. State, 280 Ala. 379, 194 So.2d 538; Carroll v. State, 45 Ala.App. 92, 225 So.2d 198.
During closing arguments appellant made a second motion for a mistrial. The prosecutor was merely referring to facts already in evidence. There was no error in denying this second motion for a mistrial. Bullard v. State, 40 Ala.App. 641, 120 So.2d 580; Arant v. State, 232 Ala. 275, 167 So. 540.
Photographs of the body of the deceased were properly admitted into evidence. Hurst v. State, 54 Ala.App. 254, 307 So.2d 62; Boulden v. State, 278 Ala. 437, 179 So.2d 20; McKee v. State, 253 Ala. 235, 44 So.2d 781; Grissett v. State, 241 Ala. 343, 2 So.2d 399.
Appellant contends that the Court erred in overruling his motion to exclude the State’s evidence with reference to the failure of the State to make out a pripia facie case of murder in the first degree, We do not agree. This was an issue for the jury and the evidence in this case fully supports the verdict of the jury. Garner v. State, 34 Ala.App. 551, 41 So.2d 634; Graham v. State, Ala.Cr.App., 339 So.2d 110.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.