[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 870 
Appellant was convicted of robbery and sentenced to ten years in the penitentiary. At arraignment, in the presence of his retained counsel, he pleaded not guilty. After sentence was imposed he gave notice of appeal. The court determined that he was indigent and a free transcript was furnished him. Trial counsel was appointed to represent him on this appeal.
On the early morning of December 4, 1978, the Bonanza Steak House on Rainbow Drive in Gadsden, Alabama, was robbed by two black males. Mrs. Eloise McKee had been employed at the Steak House for about four years. Part of her duties were to open the place every morning and get things organized for business during the day. She drove her 1976 white Chrysler Newport car to work and arrived at the Steak House between 8:15 and 8:30 the morning of the robbery which was on a Monday. She unlocked the side door and turned off the burglar alarm system. When she entered, she placed her purse and coat on the counter and went to the office to check the list of employees who were scheduled to work that day. She made a pot of coffee and went to the rest room. After returning from the rest room she got the office key from her purse and unlocked the office door to check on any instructions that might have been left by the manager when he locked the business the night before. While she was in the office she heard a noise in the storage room located directly behind the office. As she emerged from the office she was confronted by a man wearing a stocking over his face who pointed a pistol in her face. Moments later another man came from the back and he, too, was wearing a stocking over his face.
These bandits told Mrs. McKee they wanted the money from the safe. She tried to convince the men the only money in the place was in the cash register but the man with the pistol told her to stop stalling and to open the safe. He shoved her back into the office with such force that she struck the filing cabinet, hurting her shoulder and arm. With the pistol still pointed at her head, she was again ordered to open the safe. Because of the pain in her shoulder and arm she had difficulty in working the combination to the safe. She worked with the combination the second time with the pistol still pointed at her head and finally got the safe open but was unable to pull the safe door open and she told the man with the pistol that he would have to pull on the door to the safe. The robber with the gun ordered her to lie on the floor and he reached over her and pulled the safe door open and got the money bags. Mrs. McKee was asked if the keys she had to open the office door were also the keys to her automobile. She told them the keys to her car were in her purse. One of the robbers went to the front and got her car keys and they walked her to the back and shoved her in the cooler and closed the door. She remained in the cooler until she was sure they had left the premises. She came out of the cooler and discovered the robbers had taken her car and left. She immediately notified the police department that she had just been robbed and her car stolen.
The police officers promptly responded to her call and she gave them a description of the bandits and a description of her car. She told the officers that the robbers had taken about $650.00 from the safe and she told the officers that the man with the gun was a "black male, 5 feet 3 inches, stocky build, black leather jacket, no shirt, dark *Page 871 
pants and stocking over the face." She stated the other robber was taller but she did not get a good look at him but stated he had a stocking over his face and was wearing dark clothes.
The victim of this robbery testified that the voice of the robber with the gun was familiar and she kept trying to place the name of the man with that voice. She finally identified the voice as that of Fernando Ball who had worked at the Bonanza for a short while some time in the past. She was called that night by one of the investigating officers who told her they had picked up one of the suspects and wanted her to view a lineup the next day. She was not given the name of the suspect before she viewed the lineup. There were five men in the lineup and they were viewed by the victim with and without stockings over their faces. She picked out the number 4 man from the left as appellant. A photograph of the lineup was taken and shown to the victim during the trial and she again identified the number 4 man as the appellant and the man who had robbed her at gunpoint on Monday morning, December 4, 1978. She also made a positive in-court identification of appellant.
The victim was questioned about the statement she gave the police. She stated that she remembered saying that the robber with the gun had on a dark jacket, not black or brown as the statement indicated. She also said the robber was approximately five feet, three inches to five feet, five inches.
Mrs. McKee further testified that she was told that Richard Elliott was the other suspect. In her report to the police she listed Elliott's height as between six feet, three inches and six feet, five inches. She stated she had never seen any of the other individuals in the lineup previously.
John Russell Creel testified that he was the acting manager of the Bonanza restaurant that was robbed. He closed the restaurant on the night of December 3, 1978, and just before closing he placed about $650.00 in the safe and locked it. He further stated that at about 8:30 on Sunday night he received a telephone call concerning what time the restaurant would open the next morning. He did not recognize the voice of the caller but when he stated the time the cafe would open on the morning of December 4, the caller said, "Oh, wow," and hung up.
Doris Huntley testified that appellant was her son-in-law and that she recalled the events of December 4, 1978. She stated appellant had been staying with her family for about two weeks prior to the robbery and he was unemployed at that time. She said she left for work at about 8:00 a.m. on December 4, and her husband, daughter, appellant and Richard Elliott were in the car with her; that appellant and Elliott were in the back seat. She let appellant and Elliott out of the car near a place known as Merle Norman's Cosmetics which was about three buildings from the Bonanza; that appellant said that he was going to a finance company located between Merle Norman's and the Bonanza, where Elliott was to loan him some money. She described appellant as wearing blue jeans, jacket and tennis shoes. The last she saw of appellant and Elliott they were walking in the direction of Merle Norman's Cosmetics and the time was 8:10 or 8:15 a.m. She did not know Elliott but appellant told her that "Richard" was coming to the house that morning to ride with them.
Doris Huntley's husband, Jessie, testified to substantially the same facts as Doris except that he thought appellant was wearing a brown jacket and a brown shirt which had flowers on it.
Officer Harley Cutchens testified that, on December 4, 1978, he received a radio call that a robbery had occurred at the Bonanza restaurant on Rainbow Drive and he proceeded to investigate. He stated he received an all points bulletin calling for the arrest of two black males who were involved in the robbery. The robbers reportedly left in a 1976 white Dodge automobile. He and his partner, Sergeant Ballenger, turned right on 15th Street and saw a 1976 Dodge parked on the side of the road. He saw a young black male walking up the hill. *Page 872 
He got out of the car and gave "foot pursuit" in the direction the man was running. He said the fleeing man was Richard Elliott but the officer fell and lost sight of Elliott. Elliott made good his escape and at the time of appellant's trial he had not been apprehended. The car was returned to the victim.
Officer Cutchens checked the crime scene and was able to lift two partial prints inside a file cabinet. These prints could not be identified because smoke had obliterated them. He dusted the inside of the abandoned car for fingerprints and obtained partial prints from the rearview mirror and from glass on the driver's side, but they were not classifiable. He further testified that he knew Elliott "in passing" but did not know his name. He found a stocking in the car which contained hairs but the crime laboratory reported these hairs did not match the hair of appellant.
Harry Jackson testified that appellant was his brother-in-law and on the morning of December 4, 1978, around 9:10 or 9:15, he saw him walking near the corner of Harvey and Riley Streets. He asked appellant to get in the car and go with him to a named place but appellant wanted to go by his mother's house and get a suit, pants and shirt. While they were riding appellant pulled out $105.00 from his pocket. He was shown a jacket and stated appellant was wearing that type jacket when he picked him up.
Officer William A. O'Bryant testified that he participated in the investigation of the robbery of the Bonanza Steak House and got the details from Mrs. McKee. He identified a jacket shown him in court and stated that this jacket was turned over to the Police Department by appellant's brother-in-law, Harry Jackson.
O'Bryant further testified that he received information from a confidential and reliable informer who had given him information in the past, upon which arrests were made and convictions obtained, that appellant was involved in the robbery of the Bonanza Steak House. He also talked to Doris Huntley, Jessie Huntley and Harry Jackson. Based upon all this information he arrested appellant at the Nancy Oden Gymnasium on the night after the robbery and transported him to jail. The next day he gave appellant the Miranda rights and warnings and appellant stated that he understood his rights, but he refused to sign a waiver of rights form. He did make an oral statement.
A voir dire hearing was held out of the presence and hearing of the jury. O'Bryant testified at this hearing that appellant was not threatened, coerced or promised anything, nor were any rewards offered him or other inducements held out to him to get him to make a statement. He further stated that appellant told him that he, Richard Elliott, and a man by the name of Darrell Craig, robbed the Bonanza restaurant. O'Bryant testified that he knew Darrell Craig, also known as Debbie Craig, was not living in the Gadsden area at the time of the robbery. He stopped the interrogation and made a telephone call to his informer to ascertain if Craig was back in town. He was told that Craig was living in Detroit and had been there for over a year. He returned to the interrogation room and imparted this information to appellant. Appellant then changed his story and told O'Bryant it wasn't Craig with them at the time of the robbery but a man by the name of Randy McCloud who lived at 354 Starnes Park in East Gadsden. The officers went to this address and picked up Randy McCloud. He was brought to headquarters and interrogated. He denied any participation in the robbery. The officers got appellant from his cell and returned him to the interrogation room and told him they had placed Randy McCloud in jail. Appellant then said, "Turn him loose. He is not involved." McCloud was then released.
Finally, appellant admitted that he and Richard Elliott were the only persons involved in the robbery but that he did not go any further than the salad bar. He stated he was to be the look-out man. He further stated that after the robbery they needed a getaway car because they had been dropped off down there by Mr. and Mrs. Huntley. He said on leaving the place Richard Elliott *Page 873 
got Mrs. McKee's car keys out of her purse at the cash register and they took off in her car. He also admitted that he called his brother-in-law, Harry Jackson, to pick him up.
On cross-examination he testified he had gotten a signed statement from Mr. and Mrs. Huntley and Harry Jackson before he arrested appellant. O'Bryant further said they found one stocking at the water fountain inside the restaurant.
Appellant testified at the voir dire hearing and said that Officer O'Bryant arrested him. He asked the officer what he was being arrested for and O'Bryant told him he was being charged with the Bonanza robbery and that he denied the charge; that he refused to sign any statement. He stated that Officer O'Bryant hit him on the side of his head with a broken off pool stick and he fell to the floor. He testified that the officer questioned him some more and wrote out a statement for him to sign, saying, "This is the way it is going to be and if you sign it involving Randy McCloud he would free me." He refused to sign the statement. He denied that he was given his constitutional rights.
On cross-examination he testified that the money he had was his all along; that he borrowed the money from the boyfriend of Connie Jackson. He said the $105.00 was the money that Connie Jackson's boyfriend owed him.
At the conclusion of the voir dire hearing the court overruled appellant's motion to suppress the oral statement which he gave to Officer O'Bryant.
Jerry W. Alexander testified that he was a detective with the Gadsden Police Department and investigated the robbery at the Bonanza on December 4, 1978. He said he found a toboggan at the drinking fountain in the restaurant; that he interviewed appellant the day after the robbery and read him his constitutional rights; that the defendant made a statement but refused to sign anything. He further testified that appellant was not coerced, threatened, induced or promised any reward to get him to make a statement. He stated appellant implicated Richard Elliott, a third party and himself in the robbery. The third party was Randy McCloud.
On cross-examination this witness stated that appellant made the inculpatory statement before the lineup was conducted; that he prepared a report based upon the information given by the victim in which she described both bandits as five feet, three inches and five feet, eleven inches, respectively.
After the State rested appellant moved to exclude the evidence on various and sundry grounds. He contended the State failed to make out a prima facie case and that he was illegally arrested. He further contended that the identification was suggestive and that the confession was improperly admitted. The motion to exclude was overruled.
Appellant then testified before the jury. In sum, he admitted that he and Elliott rode with his father and mother-in-law on the morning of December 4, 1978. They got out of the car near the Merle Norman Cosmetics building and were going to the Finance America where Elliott was to borrow some money and loan him a sufficient amount to get his car out of the shop so that he could go to Atlanta. He and Elliott were standing near the finance company building waiting for it to open and a City squad car came up and the police told them the Bonanza had been robbed by two blacks and it wasn't cool for them to be around there; that the officer's statement scared them and they left walking. They walked across town and separated. Appellant then went to Gadsden High School. He ran into his brother-in-law, Harry Jackson, and got in the car with him. Jackson took him to his mother's house and then to the west side as he needed to pick up some money a fellow owed him. He stated that he didn't have the $105.00 when he got in Harry Jackson's car. He went to the Myrtlewood project and saw a man by the name of Afro White from whom he got $105.00. Included in this $105.00 were fives, tens and twenties, but this was not enough money to get his car out of the shop. He went to see *Page 874 
some other friends to try to borrow some money and went to Harry Jackson's place and Jackson informed him the police were looking for him and Elliott. He was arrested by the police and taken to the Police Department where he was interrogated by Officer O'Bryant. He denied that he was involved in the Bonanza robbery. He admitted being placed in a lineup with four other men and that he was told Mrs. McKee had identified him.
He further testified that he was wearing a brown jacket, a black T-shirt with his Zodiac sign on it, black hat, dark sunglasses and blue jeans. He said he was five feet, seven inches tall and weighed 153 pounds. He admitted knowing Mrs. McKee as he worked at the Bonanza about one month three years previously, but he had not seen her in three years.
On cross-examination he was asked where he got the $105.00 and he replied he got it from a relative by the name of Lawrence Ball. At this point he was impeached by his prior testimony that he had gotten the money from Afro White. He then went back to his previous statement that he got the $105.00 from Afro White. He was then impeached by his testimony given at the preliminary hearing wherein he testified that he got the $105.00 from a cousin of Richard Elliott but he did not know his name. Appellant's testimony at the preliminary hearing was read to him and then he recanted his testimony and stated that Afro White gave him the $105.00. He was impeached again by his previous testimony that he got the $105.00 from the boyfriend of Connie Jackson.
It is manifest from the evidence in this case that appellant swore that he got the $105.00 from four different persons. In his oral confession he told Officer O'Bryant that after the robbery Richard Elliott got Mrs. McKee's keys to her Chrysler automobile; that Elliott was driving the Chrysler and that he was in the back seat and, as they were leaving, the money bags were thrown on the back seat. Appellant stated that he was told he was not going to get any of the money because he was scared, but unknown to Elliott (and the other alleged occupant) he opened one of the bags of money and took a hundred and some few dollars.
Appellant contends that he was denied effective assistance of counsel. This contention is not supported by the record. The record reveals that defense counsel was very much aware of the facts and circumstances leading up to the arrest and conviction of appellant. Appellant was arrested on the night of the robbery and trial counsel was retained to represent him. A preliminary hearing was held on December 13, 1978, and he was represented by trial counsel at this hearing. Appellant was arraigned on February 5, 1979, and counsel was present. A habeas corpus petition was filed in the Circuit Court approximately one month before the trial. Trial commenced on February 6, 1979. Despite counsel's long affiliation with this case he claims that he was forced to go to trial upon six days notice and that the trial court erred in not granting him a continuance to afford him ample time to prepare for trial.
A motion for a continuance in a criminal case is addressed to the sound discretion of the trial court, the exercise of which will not be disturbed on appeal unless clearly abused. Fletcherv. State, 291 Ala. 67, 277 So.2d 882; Johnson v. State,54 Ala. App. 581, 310 So.2d 504. We find no abuse of discretion in denying a continuance in this case.
Appellant claims that his arrest was illegal and without probable cause. We do not agree. A police officer may arrest any person for a felony, although not committed in his presence, if he has reasonable cause to believe that the person arrested committed the offense. Sheffield v. State, Ala.Cr.App., 324 So.2d 319.
In determining whether there was probable cause to arrest, it is not necessary that the officer have evidence which would support a conviction for the offense. The arresting officer had received information from a reliable person that appellant was a participant in the robbery. This informer *Page 875 
had given the officer information in the past which proved to be accurate and which resulted in arrests and convictions. In addition, the robbery victim identified one of the robbers' voices as that of Fernando Ball who was a former employee of the Bonanza restaurant. She also viewed a lineup and identified the fourth man in a five-man array and he turned out to be appellant. The officer received signed statements from appellant's father and mother-in-law that they gave appellant and his accomplice a ride on the morning of the robbery and let both out of the car near the Bonanza restaurant a few minutes before the robbery was committed. We do not deem it necessary to restate the testimony of the victim of this robbery.
Officer Cutchens testified that he saw appellant's accomplice, Richard Elliott, near the stolen car. A stocking was found in the stolen automobile.
Harry Jackson informed the officers that he picked up appellant around 9:10 a.m. on the day of the burglary and that he pulled out $105.00 from his pocket.
In Henry v. United States, 361 U.S. 98, 80 S.Ct. 168,4 L.Ed.2d 134, the Supreme Court held:
 The rule of probable cause is a practical nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.
Armed with all of the above information the arresting officer certainly had probable cause to arrest appellant and charge him with the robbery of the Bonanza restaurant. As this court said in Braxton v. State, Ala.Cr.App., 350 So.2d 753:
 ". . . The law does not require the police officers to have evidence which would conclusively establish guilt, but merely facts which would warrant a man of reasonable caution to believe that the appellant had violated the law. The test is a pragmatic one, seeking to balance the welfare of the public against the ability of law enforcement (officers) to effectively maintain law and order . . ."
Appellant claims that his confession was not voluntary and should have been excluded. An extra-judicial confession, oral or written, is prima facie involuntary and inadmissible and the duty rests in the first instance on the trial court to determine whether the confession is voluntary, and, unless it so appears, it should not be admitted. Pike v. State, Ala.Cr.App., 340 So.2d 865; Rainer v. State, Ala.Cr.App.,342 So.2d 1348; Hardin v. State, Ala.Cr.App., 344 So.2d 234.
The voluntariness of an alleged confession is a question of law for the court upon preliminary proof, showing the circumstances surrounding the alleged confession, taken outside the hearing of the jury, and such finding will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Balentine v. State, Ala.Cr.App., 339 So.2d 1063, certiorari denied, Ala.,339 So.2d 1070; Stewart v. State, 49 Ala. App. 681, 275 So.2d 360.
The rule announced in Balentine and Stewart, supra, was fully complied with in this case and the confession was properly admitted into evidence.
The acts, declarations and demeanor of the accused, before and after the commission of the offense, whether a part of the res gestae or not, are admissible against him, but, unless a part of the res gestae, are not admissible for him. Davis v.State, Ala.Cr.App., 331 So.2d 813; Hoback v. State, Ala.Cr.App., 338 So.2d 439.
Finally, appellant complains that the prosecutor in closing argument made reference to the absence of Richard Elliott as a witness for appellant. It is the general rule that one party may not comment unfavorably on the other party's failure to produce a witness supposedly favorable to that party if the witness is equally available to both sides. Hurst v. State,54 Ala. App. 254, 307 So.2d 62. *Page 876 
The accomplice, Richard Elliott, had made good his escape and was certainly not available as a witness for the State. We construe the argument as a comment upon the weakness of appellant's testimony, which is a valid subject of argument.Hill v. State, Ala.Cr.App., 348 So.2d 848.
We have carefully examined the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.